Marilyn M. MULHALL,
Plaintiff–Appellant,

v.

ADVANCE SECURITY, INC., Figgie
International, Inc., Defendants–
Appellees.

No. 93–8481.

United States Court of Appeals,
Eleventh Circuit.

April 22, 1994.

Richard N. Hubert, Chamberlain Hrdlicka White Williams & Martin, Atlanta, GA, for plaintiff-appellant.

Edward Katze, Kimberly Anne Weber, Constangy Brooks & Smith, Atlanta, GA, James G. Johnson, Hill Farrer & Burrill, Los Angeles, CA, for defendants-appellees.

Before BLACK, Circuit Judge, FAY, Senior Circuit Judge, and UNGARO–BENAGES *, District Judge.

FAY, Senior Circuit Judge:

This is a disparate pay employment discrimination suit. Plaintiff, a former employee of defendant corporations, appeals the district court's grant of summary judgment on behalf of defendants. The district court's order disposed of plaintiff's claims brought under the Equal Pay Act,[1] Title VII of the Civil Rights Act of 1964,[2] the Civil Rights Act of 1991,[3] and various state law causes of action. We AFFIRM summary judgment on the claims arising under state law,[4] resting on the Civil Rights Act of 1991, and resulting from defendants' failure to promote plaintiff. We VACATE and REMAND for further consideration the disparate pay claims arising under the Equal Pay Act and the Civil Rights Act of 1964.

## I. BACKGROUND

### A. Facts

Plaintiff Marilyn Mulhall worked for Defendant Advance Security, Inc. ("Advance")

---

* Honorable Ursula Ungaro–Benages, U.S. District Judge for the Southern District of Florida, sitting by designation.

1. 29 U.S.C. § 206(d)(1).

2. 42 U.S.C. § 2000e, et seq.

3. 42 U.S.C. § 1981.

4. Plaintiff alleged Georgia tort law causes of action of intentional misrepresentation, invasion of privacy, and intentional infliction of emotional distress. We agree with the district court that these claims are barred as a matter of law, and discuss them no further.

from 1978 until her resignation in 1991. Advance is a Georgia-based company that provides security services to customers around the country. It is a wholly-owned subsidiary of Defendant Figgie International, Inc. ("Figgie").

Advance employed plaintiff as a Manager of Services in 1978, promoted her to Manager of Administration in 1979, and subsequently promoted her to Vice–President, Administration in 1981. She remained in this position until 1991, when she resigned. As Vice–President, Administration, Mulhall's responsibilities included risk management, personnel, loss prevention, salary administration, worker's compensation, purchasing, litigation, general liability insurance claims, group insurance programs for hourly personnel, hourly personnel 401(k) programs, salaried employees' payroll, equal employment opportunity, affirmative action, fidelity insurance claims, contract reviews, insurance certification programs, labor relations, applicant and employee testing programs, licensing, leases, corporate services and staff, and the Department of Defense industrial security program. On the government contracts, she had operational responsibility and did short and long-term cost-forecasting. Mulhall had a clear understanding of the financial relationship between Figgie and Advance.

Plaintiff was the only female within Figgie with responsibility for a profit center in addition to her duties as a corporate staff department head. She was the only manager or vice-president responsible for a profit center who did not receive bonuses based on the profitability of the profit center. Plaintiff argues that Advance should have paid her $55,979 in bonuses between 1986 and 1990.

In 1984, Advance placed Mulhall in the Figgie Executive Compensation Program, entitling her to an executive bonus in addition to her base salary. Only three Advance employees were in the compensation program at that time: the Vice–President, Administration (Mulhall), the Vice–President, Controller (Michael Roquemore, Larry Nelson's predecessor), and the President. Bonuses arising from the operation of a profit center were apparently distinct from those springing from the Executive Compensation plan.

The success of plaintiff's suit under both the EPA and Title VII rests on the comparison of her pay and job functions with those of persons whom she designates as "comparators." [5] She names eight men whose positions are discussed here, as they were in the district court, based on logical groupings.

Group 1 consists of three project managers working on two of Advance's government contracts: Joe Beranek and his replacement, Richard Johnson from the Sandia Livermore contract (in Nevada), and Michael Zimmerman from the Sandia Tonapah contract (in California).[6]

Group 2 consists of one individual, William Hill. Hill was hired in 1988 to start up Investigations Corporation of America ("ICA"), a new division of defendant corporations.

Group 3 consists of one individual, Larry Nelson, Advance's Vice–President, Controller.

Group 4 consists of three individuals who were formerly owners or principals in businesses purchased by Advance: Guido Massimei and John Gregg, Vice–Presidents, Operations, and Edward Trumbull, Regional Manager.

Unquestionably, all eight comparators are male and all earned more money than plaintiff.[7] Where necessary, we will discuss at length the specifics of their jobs.

**5.** *See, e.g., Gosa v. Bryce Hosp.,* 780 F.2d 917, 918 (11th Cir.1986).

**6.** These were government contracts for security services at military facilities.

**7.** In 1984, when she became a vice president, Plaintiff earned $35,500 base pay. Her 1991 salary was $52,500.
   We cannot discern from the record the exact disparity in plaintiff's salary and those of the

Group 1 comparators, although defendants agree that plaintiff earned less base pay than each comparator at all relevant times. It is clear that in 1989 plaintiff earned a base salary of $47,000 while Beranek was paid $58,000. Advance increased Beranek's salary to $70,000 in 1990 while plaintiff received only a $3,000 increase, resulting in a $20,000 discrepancy between plaintiff and her subordinate.

### B. Procedure

In September 1990, prior to her resignation, Mulhall filed a charge of discrimination with the EEOC. That charge stated in full:

I. I have worked for the company for twelve years. I have been in the position of Vice President since 1981. I am denied equal pay for the work I perform.

II. I was given no satisfactory reason for the harm I experienced.

III. I believe that I was discriminated against because of my sex (female) in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Equal Pay Act.

The present suit was filed in May, 1991, resting exclusively on equal pay violations arising under the EPA and Title VII. Mulhall later amended her complaint to assert claims for denial of promotion and state tort law violations. The district court granted defendants' motion for summary judgment, adopting the Magistrate Judge's Report and Recommendation in full.

Specifically, the court held that as to the EPA claims: Group 1 (Beranek, Zimmerman, and Johnson) did not consist of proper comparators because the men did not work in the same establishment as plaintiff; Group 2 (Hill) and Group 3 (Nelson) were not proper comparators because their jobs did not require substantially similar skill, effort and responsibility as plaintiff's; in the case of Hill, work did not occur in the same conditions as plaintiff's; and Group 4 (Massimei, Gregg, and Trumbull) consisted of proper comparators but there was no genuine issue of material fact regarding defendants' affirmative defense that they paid the men higher salaries for a reason other than sex.

The district court also granted summary judgment in favor of defendants on plaintiff's Title VII claims because: as to Group 1 (Beranek, Zimmerman, and Johnson) and Group 4 (Massimei, Gregg, and Trumbull), although plaintiff established her prima facie case, she failed to prove that the nondiscriminatory reasons proffered by defendant for the pay disparity were pretextual; and as to Group 2 (Hill) and Group 3 (Nelson) plaintiff failed to establish a prima facie case for the same reasons discussed in the EPA claims.

Finally, the court ruled that (1) plaintiff's promotion claims brought under the EPA and Title VII were barred by her failure to file an administrative complaint alleging discriminatory denial of promotion;[8] and (2) the Civil Rights Act of 1991 did not operate retroactively.[9]

## II. STANDARD OF REVIEW

We review *de novo* a district court's grant of a motion for summary judgment. *Brown*

---

The disparity between plaintiff's salary and that of the Group 2 comparator was approximately $26,500 in 1989 and $27,000 in 1990.

The disparity between plaintiff's salary and that of the Group 3 comparator ranged from approximately $6,500 (Mulhall's 1987 salary compared to Roquemore's 1987 salary) to $22,000 (Mulhall's 1989 salary compared to Nelson's 1989 salary).

The disparity between plaintiff's salary and those of the Group 4 comparators ranged from a low of approximately $17,000 dollars (Mulhall's 1990 salary compared to Gregg's 1990 salary) to a high of approximately $35,500 (Mulhall's 1988 salary compared to Trumbull's 1988 salary). Advance awarded each comparator in this group bonuses based on the performance of his profit center.

**8.** We affirm the district court's conclusion as to plaintiff's promotion claims. A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.1970) (Title VII complaint may encompass discrimination *like or related to* allegations contained in the EEOC charge and growing out of such allegations during the pendency of the case before the Commission.) A claim of unequal pay is not the equivalent of a claim alleging a failure to promote. Mulhall's EEOC complaint and the resulting investigation would not trigger an inquiry into defendants' promotion practices. Accordingly, plaintiff's promotion claims were correctly barred. *See also, King v. Seaboard Coast Line R. Co.*, 538 F.2d 581, 583 (4th Cir. 1976); *Johnson v. Richmond County*, 507 F.Supp. 993, 995 (S.D.Ga.), *aff'd in part*, 732 F.2d 942 (11th Cir.1984); *King v. Georgia Power Co.*, 295 F.Supp. 943, 947 (N.D.Ga.1968).

**9.** The district court correctly ruled that the Act applies prospectively only, thereby defeating plaintiff's contention that it should apply to her claims arising prior to the statute's enactment. *See, Goldsmith v. City of Atmore*, 996 F.2d 1155, 1159 (11th Cir.1993); *Vance v. Southern Bell Tel. & Tel. Co.*, 983 F.2d 1573 (11th Cir.1993); *Curtis v. Metro Ambulance Serv., Inc.*, 982 F.2d 472, 473–74 (11th Cir.1993). Plaintiff's appeal on this issue ends here.

*v. Crawford,* 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied,* 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991). On a motion for summary judgment, the court must assess the proof in order to see whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate only if the record shows that there is no genuine issue as to any material fact. Fed. R.Civ.P. 56(c). The substantive law identifies which facts are material, and the trial judge ruling on a summary judgment motion evaluates the evidence presented by the substantive evidentiary burden. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 254, 106 S.Ct. 2505, 2510, 2513, 91 L.Ed.2d 202 (1986). Material facts are those that might affect the outcome of the suit under the governing law. *Id.* at 248, 106 S.Ct. at 2505. All justifiable inferences about the facts must be resolved in favor of the non-movant. *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotations marks and citations omitted). Finally, the court must avoid weighing conflicting evidence or making credibility determinations. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992).

## III.  ANALYSIS

### A.  The Equal Pay Act Claims

Plaintiff's claims of employment discrimination are based in part on the Equal Pay Act (the "EPA"), 29 U.S.C. § 206(d), which provides:

> No employer ... shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishments at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work in jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions, except where such payment is made pursu-

ant to ... (iv) a differential based on any other factor other than sex....

Where summary judgment is granted on claims arising under the EPA, we must first review the evidentiary burdens assigned to the parties under the substantive law as dictated by the statute, and then superimpose on that framework the proper summary judgment analysis.

In *Schwartz v. Florida Bd. of Regents,* 807 F.2d 901 (11th Cir.1987), this Court analyzed the shifting burdens in a sex discrimination case brought under the EPA. Initially, the burden rests with the plaintiff to show "that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility.' " *Id.* at 907 (quoting *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974)). The statute also provides a "geographic limitation." Those employees against whom plaintiff compares herself must work in the same "establishment" as the claimant. *Brennan v. Goose Creek Consolidated Indep. Sch. Dist.,* 519 F.2d 53, 57 (5th Cir.1975).[10] Plaintiff establishes a prima facie case by satisfying both the geographic and descriptive components of the test as applied to even one comparator. *Mitchell v. Jefferson County Bd. of Educ.,* 936 F.2d 539, 547 (11th Cir.1991); *EEOC v. White & Son Enters.,* 881 F.2d 1006, 1009 (11th Cir.1989).

The burden then shifts to the defendant to prove by a preponderance of the evidence that the differential in pay is justified by one of the four exceptions set forth in the statutes. *Id.* (citing *Brock v. Georgia Southwestern College,* 765 F.2d 1026, 1036 (11th Cir. 1985)). In fact, defendants must show that the factor of sex provided *no basis* for the wage differential. *Id.* (emphasis added); *Gosa v. Bryce Hospital,* 780 F.2d 917, 918 (11th Cir.1986) (the requirements for proving an exception are not met unless the factor of sex provides no part of the basis for the wage differential). Defendants' burden is a heavy one—the exceptions granted within the EPA constitute affirmative defenses. *Corning Glass Works,* 417 U.S. at 196–197, 94 S.Ct. at

**10.** In *Bonner v. Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent those cases decided by the Fifth Circuit prior to October 1, 1981.

2229 (1974). If proven, defendant is absolved of liability as a matter of law.

Where, as here, defendants moved for summary judgment, the court must evaluate all evidence proffered by plaintiff in the light most favorable to her case. Once she establishes a prima facie case of discrimination in pay based on sex, the success of defendants' motion rests · on their ability to prove an affirmative defense. Thus, by moving for summary judgment under the EPA, defendants thrust before the court for scrutiny not only the merits of plaintiff's evidence, but the strength of their own defense and must establish that there is an absence of any issue for jury resolution.

### GROUP 1 COMPARATORS

#### 1. The Prima Facie Case

■ The district court held that Beranek, Zimmerman and Johnson were not proper comparators because they did not work at the same establishment as plaintiff, thereby eviscerating plaintiff's prima facie case.

The term "establishment" is defined by the Secretary of Labor as "a distinct physical place of business rather than ... an entire business or 'enterprise' which may include several separate places of business." 29 C.F.R. § 1620.9(a) (1993). Nonetheless, the former Fifth Circuit recognized in Goose Creek that there are situations in which a single establishment can include operations at more than one physical location. Goose Creek, 519 F.2d at 56. A contrary result obtained through narrow construction of the word "establishment" could "make proof of discrimination more difficult, thus frustrating congressional intent." Id. at 57. Goose Creek set a widely followed standard recognizing that central control and administration of disparate job sites can support a finding of a single establishment for purposes of the

EPA.[11] The hallmarks of this standard are centralized control of job descriptions, salary administration, and job assignments or functions. Brownlee v. Gay and Taylor, Inc., 642 F.Supp. 347, 352 (D.Kan.1986).

Defendants and the district court rested their conclusion that the project managers did not work in the same establishment as plaintiff on Foster v. Arcata Assocs., Inc., 772 F.2d 1453 (9th Cir.1985), cert. denied, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986). We recognize the similarities between the facts in Foster and the present case, but find them distinguishable on the essential variables. Both cases involve contracts to provide services to, among others, armed forces facilities. Both present a plaintiff working at defendant corporation's main offices who compares herself to Project Managers working at military sites in different locations. With that, the similarities end.

In Foster, defendant corporation provided different types of services for each military facility; here, defendants provide security services for both facilities. In Foster, the project managers had independent decision-making authority over their staffs; here, the project managers reported to plaintiff. Indeed, one project manager stated that he "was in continual contact with Ms. Mulhall concerning all aspects of Advance's operations ... kept her fully briefed ... sought her approval on all significant situations ... ¹seldom made any moves as project manager without first consulting Ms. Mulhall." Beranek Affidavit at 2–3. Furthermore, "Mulhall ... determined all cost items, wages and benefit levels." Beranek Affidavit at 2.

Also significant is Advance's response when another company offered Beranek a job in 1989. Defendant immediately increased the project manager's salary by $12,-000 and added benefits sufficient to keep him

---

11. See e.g., Marshall v. Dallas Indep. Sch. Dist., 605 F.2d 191, 193 (5th Cir.1979) (all schools in a district under the control of a central administrative office constitute a single establishment); American Fed'n of State, County and Municipal Employees v. County of Nassau, 609 F.Supp. 695, 706 (E.D.N.Y.1985) (a significant functional relationship between the work of employees in disparate locations gives rise to the finding of a single establishment under the EPA; geographic con-

siderations are merely one factor in the analysis); Grumbine v. United States, 586 F.Supp. 1144, 1148 (D.D.C.1984) (establishment is not automatically determined by geography but depends partially on degree of centralized personnel administration); Alexander v. Univ. of Michigan–Flint, 509 F.Supp. 627, 629 (E.D.Mich.1980) (single establishment existed where administrative office had authority to hire, fire, and set wages).

employed at the Livermore facility. This response further demonstrates defendants' control over implementation of the contract and operations at the facility.

These distinctions are dispositive. A reasonable trier of fact could infer that because of centralized control and the functional interrelationship between plaintiff and the comparators in Group 1, a single establishment exists for purposes of the EPA. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir.1992) ("If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment.") In keeping with this Circuit's precedent and the weight of other authority, summary judgment for defendants was improper if based solely on the establishment prong of the prima facie case.

In its discussion of the Title VII claims using Group 1 as comparators, the district court ruled (and defendants conceded) that Beranek, Zimmerman, and Johnson occupied positions requiring substantially similar skill, effort, and responsibility to that of plaintiff. Consequently, Mulhall established a prima facie case regarding these comparators.

### 2. The Affirmative Defense

We cannot affirm summary judgment regarding the Group 1 comparators unless defendants prevailed on their affirmative defense to the EPA claim. The district court did not reach defendants' affirmative defense.[12] We reverse summary judgment as to the Group 1 comparators because nothing in the record or in the district court order suggests that defendants met their burden of persuasion on an affirmative defense under the EPA.[13]

### GROUP 2 COMPARATOR

### 1. The Prima Facie Case

The district court ruled that plaintiff's job and that of Group 2 comparator William Hill

did not require substantially similar skills, efforts, and responsibilities, and that Hill's and Mulhall's working conditions were dissimilar. Thus, the court found that plaintiff failed to establish a prima facie case sufficient to withstand the motion for summary judgment on the EPA claim.

In Equal Pay Act cases, we compare the jobs, not the individual employees holding those jobs. *Miranda*, 975 F.2d at 1533. Only the "skills and qualifications actually needed to perform the jobs are considered." *Id.* Comparators' prior experience is not relevant to the "substantially similar" inquiry. *Id.* The examination also rests on primary, as opposed to incidental or insubstantial job duties. *Id.* Job titles are a factor for consideration, but are not dispositive. *Id.* The plaintiff need not prove that her job and those of the comparators are identical; the test is one of substantiality, not entirety. *Id.* Nonetheless, in EPA cases "[t]he standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir.1989). If plaintiff's evidence, with all inferences drawn in her favor, establishes an EPA violation and there is sufficient evidence such that a jury could find in her favor, then summary judgment for defendants is improper. *Id.*

William Hill joined Advance in 1988 when defendants created an investigations division to supplement their security services. Hill's responsibilities included formulating the new business, obtaining clients, and creating administrative processes and marketing strategies. He also reviewed ICA's affirmative action plan, maintained employee hiring and promotion logs, administered the EEO policy, and coordinated activities with other components of Advance.

We have no doubt that investigative and administrative work are dissimilar. Howev-

---

**12.** We note that defendants asserted "a factor other than sex" EPA defense to the Title VII claim regarding these comparators. The district court's ruling on Title VII is not dispositive because defendants bear only a burden of produc-

tion there, but must prevail on an affirmative defense under the EPA by a burden of persuasion. *See infra* Pt. III.B.

**13.** *See infra* Pt. III.B.

er, the initial question presented is whether the administrative work of starting and running a new division was substantially similar to the administrative work performed by the Vice President for Administration. Both positions are fairly described as "corporate department heads," with both plaintiff and Hill reporting to Advance's president. Many of the job functions are identical. For example, both employees had responsibilities vis-a-vis affirmative action, EEO, and coordination with other corporate entities.

Defendants place much emphasis on Hill's responsibility to acquire clients. Plaintiff argues that preparing bids for new clients and managing the resulting contracts require equal skill, effort and responsibility. She asserts that Advance's government contracts were obtained and maintained as a result of her efforts. [Exhibit 3 to Defendant's Deposition of Marilyn Mulhall on April 30, 1991.] We cannot say as a matter of law, drawing all inferences in favor of plaintiff as nonmovant in this motion for summary judgment, that this aspect of plaintiff's and Hill's positions are not substantially similar. Nor do we find any evidence in the record to support the district court's finding that Hill and Mulhall worked in dissimilar conditions.[14]

We cannot so easily dismiss the investigative component of Hill's job. While there is no evidence before us of the time actually spent in this particular job function, investigative skills no doubt play some role in one's ability to direct investigations, making investigative knowledge more than an incidental part of Hill's position. Plaintiff does not assert that she possessed any investigative skills. Accordingly, we agree with the district court that under the strict similarity requirement imposed in EPA cases, the plaintiff failed to establish a prima facie case as it relates to the Group 2 comparator, William Hill. We affirm this aspect of the district court's ruling and go no further as to this comparator.

14. Presumably, this finding rested on a conclusion that investigations take place "in the field." Even if there were evidence supporting this conclusion our opinion would not change; Mulhall

### GROUP 3 COMPARATOR

#### 1. The Prima Facie Case

█ The district court determined that plaintiff failed to establish a prima facie case regarding Larry Nelson, Vice–President, Controller of Advance, because his job required different skills, effort, and responsibilities. Thus, the district court ruled that Nelson, who did not become controller until 1989, was an improper comparator for the EPA action.

Transformations in the controller position punctuated the years in question. From 1984 to 1985, both plaintiff's position and that of the controller (Nelson's predecessor) were identified as job class IV. Advance labelled both positions "vice-president." Defendants do not seem to dispute the proposition that the assignments entailed substantially similar skills, efforts, and responsibilities in the early 1980's. Neither the controller nor Mulhall were accountants. During these years the controller earned approximately $7000 more than plaintiff. In 1985, plaintiff's executive performance appraisal reflected an evaluation of 45.5 points with a recommended merit increase of 12%. Defendant Figgie reduced the increase in plaintiff's compensation to 6.7%. At the same time, the Vice–President, Controller received an evaluation of 34.2 points and obtained a merit increase of 5.9%.

In 1986, Advance upgraded the controller position to job class V and shifted many of his responsibilities to plaintiff's position by 1987. Defendants do not explain the reason for upgrading the controller's position while divesting him of numerous functions. Nor do they explain why plaintiff's job class was not raised when she was assuming responsibilities previously assigned to another vice president. We also note that defendant placed plaintiff in its executive compensation plan in 1984, when the only other participants were the president and the controller. Drawing all inferences in favor of the nonmovant, as we must, we find nothing in the record defeating plaintiff's contention that the vice presidents' positions were substantially similar from as early as 1984 until at

worked "on site" at the Sandia Livermore facility not only for the period of contract start-up but also during supervisory visits.

least 1987.[15] Thus, we hold that plaintiff established a prima facie case regarding the pay disparity for at least that period.[16]

Advance fired Nelson's predecessor in 1988. The position was quickly upgraded to job class VI, and then upgraded without being filled to job class VII (a category matching Nelson's previous assignment) just before Nelson assumed the position. Meanwhile, plaintiff remained in job class IV until her resignation. The district court apparently focused on the controller position as it currently exists, granting summary judgment for defendants due to disparity in the skills, efforts and responsibilities entailed in filling the positions since Nelson's arrival.

The position now carries responsibility to plan, organize, direct and control defendants' accounting and financial functions, including credit collection and billing. We are not convinced that skills needed in the controller position, even as it is currently structured, are not substantially similar to those of the vice-president for administration. Advance's economic well-being is obviously the controller's main responsibility, but he also manages a staff and credit collection and billing—functions steeped in the administrative tradition. Meanwhile, monetary concerns permeate all aspects of plaintiff's position.[17]

Nelson is an accountant; plaintiff is not. Defendants deny that an accounting degree is a job requirement but seemingly rely on Nelson's "understanding and belief that a degree in accounting as well as accounting experience are required for the proper per-

formance of these duties." [Nelson Affidavit ¶ 5.] Although one could argue that defendants' argument raises, rather than eliminates a question of material fact, we need not reach that conclusion in order to dispose of this alleged distinguishing factor. We have previously stated that "the prima facie case is made out by comparing the jobs held ... not by comparing the skills and qualifications of the individual employees holding those jobs." *Brock*, 765 F.2d at 1032.[18] Thus, Nelson's education and his opinion about a controller's preferred academic background are irrelevant at this juncture. Accordingly, we cannot agree with the district court that plaintiff's and Nelson's positions were distinguishable on the basis of skills.

Given our discussion of the skills involved, little analysis of the relative effort demanded to accomplish plaintiff's and Nelson's jobs is required. Both positions obviously necessitated great effort. If anything, we believe a jury could conclude that plaintiff's position, because of its diverse components, took greater effort than did the controller's relatively homogenous job tasks. Defendants failed to demonstrate that the controller exerts greater effort in his job than does plaintiff.

Moving then to the question of responsibility, we observe that both plaintiff and the controller reported directly to Advance's president, and both had ultimate responsibility as corporate heads for their divisions. Both were responsible for millions of dollars

---

**15.** The parties are not foreclosed from more precisely defining the relevant dates.

**16.** We are not troubled that plaintiff did not specifically name Nelson's predecessor as a comparator. In Equal Pay Act cases we compare the jobs, not the individuals filling the positions. *Miranda*, 975 F.2d at 1533. Additionally, the pleadings, arguments, depositions, and exhibits address the controller position from the early 1980's to 1991. Defendants have never suggested that plaintiff may not utilize the controller position for that entire period for purposes of comparison.

**17.** *See infra* Pt. I.A. for plaintiff's job description. Significantly, plaintiff handled risk management, general liability insurance claims, and acted as liaison with outside counsel on litigation. She determined Advance's position on each claim. Mulhall managed all cost, wage, and benefit pro-

grams on the government contracts, with responsibility for approximately $5,000,000 per year in those areas alone. These tasks included negotiating labor contracts for the Tonopah facility and forecasting long and short-term costs for both government projects. Mulhall's purchasing budget was approximately $2,000,000. Additionally, she maintained forty-eight leases and renegotiated the 1990 corporate headquarter's lease at a savings of $4.38/sq. ft. with concessions in parking, redecorating, and space. We believe a jury could find these tasks inextricably intertwined with the corporation's financial future.

**18.** In *Brock*, we observed that individual employee qualifications are relevant only to defendant's affirmative defenses. *Brock*, 765 F.2d at 1033 n. 9.

in corporate spending. Defendants apparently believe that the ultimate responsibility for corporate money is greater in kind than the ultimate responsibility for administration of the business as a whole.[19] One vice president manages money primarily and people secondarily; the other manages people and things primarily and money secondarily. We cannot agree with the district court that as a matter of law responsibilities inherent in the controller's and plaintiff's positions were not substantially similar.

A reasonable jury could certainly infer, as plaintiff suggests, that her position and that of the controller are substantially similar for purposes of the EPA. Accordingly, plaintiff met her burden of establishing a prima facie case regarding the vice president, controller.

### 2. The Affirmative Defense

We cannot affirm summary judgment regarding the Group 3 comparator unless defendants prevailed as a matter of law on their affirmative defense to the EPA claim. The district court did not reach defendants' affirmative defense.[20] We reverse summary judgment as to the Group 3 comparator because nothing in the record or in the district court order suggests that defendants met their burden of persuasion on an affirmative defense under the EPA.[21] Again, we note the difficulty inherent in disposing of such an issue by way of summary judgment. Credibility and the weight to be given such "explanations" are traditionally matters left to the consideration of fact finders.

### GROUP 4 COMPARATORS

### 1. The Prima Facie Case

The district court found, and we agree, that plaintiff established a prima facie case regarding the comparators in Group 4 (Massimei and Gregg, Vice–Presidents, Operations, and Trumbull, Regional Manager). Accordingly, we move directly to review the district court's ruling that defendants proved their affirmative defense by a preponderance of the evidence.

### 2. The Affirmative Defense

Defendants responded to the prima facie case by claiming that a factor other than sex justified the pay disparity, to wit: the comparators were formerly owners or principals in businesses purchased by Advance and their salaries were set as part of the negotiated sale of the businesses. In ruling for defendants, the district court relied on the principle of "red-circling."

The term "red circle" describes "certain unusual, higher than normal, wage rates which are maintained for many reasons." *Gosa v. Bryce Hospital,* 780 F.2d 917, 918 (11th Cir.1986). Congress intended to include this practice as a factor other than sex that explains a wage differential and constitutes an affirmative defense. *Id.,* H.R.Rep. No. 309, 88th Cong., 1st Sess. 3 (1963), reprinted in 1963 U.S.Code Cong. & Ad.News 687–689. An example of legitimate red circling is when an employer transfers an employee from a skilled job to a less demanding position but continues to pay the transferee at the higher pay rate in order to have her available again when needed in the former job. U.S.Code Cong. & Ad.News at 689. Numerous courts, including ours, acknowledge red-circling where current employees are transferred to lower paying positions but retain their higher pay. *Corning Glass Works,* 417 U.S. at 210, 94 S.Ct. at 2235–36; *Gosa,* 780 F.2d at 918; *Maxwell v. Tucson,* 803 F.2d 444, 445 (9th Cir.1986); *Grann v.*

---

**19.** Ironically, the present suit demonstrates the nexus between Mulhall's job responsibilities and those of the controller. Plaintiff's position entailed monitoring EEO and affirmative action policies and litigation. Corporate liability established via an employment discrimination suit of this nature could have a devastating financial impact on the organization. Obviously, both the controller and vice-president for administration shared concerns and expended energy to minimize defendants' potential losses arising from employment discrimination claims.

**20.** We note that defendants asserted "a factor other than sex" EPA defense to the Title VII claim. The district court's ruling on Title VII is not dispositive because defendants bear only a burden of production there, but must prevail on an affirmative defense under the EPA by a burden of persuasion. *See infra* Pt. III.B.

**21.** *See infra* Pt. III.B.

*Madison,* 738 F.2d 786, 790 (7th Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 296, 83 L.Ed.2d 231 (1984) (extending red circling to a promoted employee); *Bence v. Detroit Health Corp.,* 712 F.2d 1024, 1029–30 (6th Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1282, 79 L.Ed.2d 685 (1984); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 249 n. 99 (5th Cir.1974). When a claimant identifies a legitimately red circled employee as a comparator, the employer has an affirmative defense.

Neither the district court nor defendants direct us to any case explicitly extending the red-circling affirmative defense to a situation involving *new* employees paid higher wages than existing employees in comparable jobs. Nor has our research identified such a case. Furthermore, legislative history suggests that this extension was not considered: the congressional explanation for "red-circling" refers to wages maintained (not *created*) for a valid reason. This terminology, in combination with the examples given, convinces us that legislators did not contemplate applying the term "red-circling" to a situation like that at bar where a plaintiff makes a prima facie case of discriminatory wage differential between herself and new employees brought into the organization to fill comparable positions.

■ With red circling removed as the justification for the wage disparity, we examine the record for evidence of another "factor other than sex" upon which defendant may properly rest its defense. The exception also applies when "the disparity results from unique characteristics of the same job; from an individual's experience, training, or ability; or from special exigent circumstances connected with the business." *Glenn v. General Motors Corp.,* 841 F.2d 1567, 1571 (11th Cir.1988), *cert. denied,* 488 U.S. 948, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988); 1963 U.S.Code Cong. & Ad.News 689.

Defendants argue that the wages were simply part of the larger negotiation picture surrounding the purchase of the comparators' businesses. Defendants seemingly suggest that market forces demanded paying higher wages to the men in order to sweeten the purchase deals.[22] Assuming some truth underlies defendants' assertion, we are still unable to explain defendants' failure to at some point raise plaintiff's pay to match or exceed that of the comparators when her profit center outperformed Massimei's during four out of five years and Trumbull's during all three years of comparison.[23] Defendants hope to ward off this analysis by labelling the argument one of "comparable worth." We need not decide the merits of the comparable worth theory here for two reasons: first, plaintiff's argument does not, by definition, depend on comparable worth;[24] second, defendants made employees' contributions relevant to salary increases in their response to interrogatories.[25]

---

22. If we read defendants' position accurately, it comes precariously close to the market force justification for disparate wages long rejected as a legitimate affirmative defense. *Corning Glass Works,* 417 U.S. at 205, 94 S.Ct. at 2233; *Glenn,* 841 F.2d at 1570.

23. Mulhall's profits exceeded Massimei's by as little as approximately $290,000 in 1986 to as much as $546,000 in 1989, and were less than the comparator's in 1990 only because of a temporary account in Massimei's division. Trumbull's division *lost* money consistently.

24. Comparable worth means "increased compensation on the basis of a comparison of the intrinsic worth or difficulty of their job with that of other jobs in the same organization or community." *County of Washington v. Gunther,* 452 U.S. 161, 166, 101 S.Ct. 2242, 2246, 68 L.Ed.2d 751 (1981). Some courts have held that comparable worth is not a valid consideration in pay discrimination suits. *See e.g., Davidson v. Board of Governors of State Colleges and Universities, etc.,* 920 F.2d 441, 446 (7th Cir.1990); *American Fed'n of State, etc. v. Washington,* 770 F.2d 1401, 1408 (9th Cir.1985); *Lemons v. Denver,* 620 F.2d 228, 229 (10th Cir.), *cert. denied,* 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980).

25. Plaintiff's Interrogatory No. 19 asked:

State each and every fact with particularity that Defendants considered in setting the amount of compensation to be paid to the following Advance employees at the time of hiring and each time each employee received a salary increase: Marilyn M. Mulhall, G.R. Massimei, J.R. Gregg, Ed Trumbull, William Hill, Larry V. Nelson, Michael Zimmerman, Richard F. Johnson, and Joseph Beranek. Defendants responded in relevant part:

In addition, general considerations with respect to determining salary increases include

We do not hold that an employer may never pay higher wages to a new employee whose position results from the purchase of his business. We simply hold that the record before us does not establish as a matter of law that comparators' superior experience, training or ability, or exigent business circumstances justified greater compensation than received by plaintiff who occupied a similar position for five years before the comparators' arrival and who consistently outperformed two of the three comparators on the very measures defendants admit constitute a basis for setting salaries. Nothing in the record establishes that the disparity in plaintiff's and the comparators' wages was attributable solely to any recognized exception to the EPA.

Because we find that plaintiff established a prima facie case as to the Group 4 comparators, and that defendant did not establish that there is no genuine issue of material fact as to its affirmative defense, we reverse the district court's grant of summary judgment on plaintiff's EPA claims to the extent they are based on Group 4 comparators.

### Summary—Equal Pay Act Claims

We reverse the district court's grant of summary judgment for defendants as it relates to the comparators in Groups 1, 3, and 4. We find that genuine issues of material fact exist regarding whether plaintiff and the men in Group 1 worked in a single establishment, and whether plaintiff and the Group 3 comparator performed substantially similar work. We further hold that defendants failed to establish their affirmative defense as a matter of law as it relates to Groups 1, 3, and 4 comparators. We affirm the district court's grant of summary judgment to defendants regarding the Group 2 comparator, William Hill, whose job was not substantially similar to that held by plaintiff under the strict standards employed in Equal Pay Act cases.

recent job performance, profitability of the company, and contribution of each individual employee. [Exhibit 1 to Plaintiff's Response to Defendant's Motion for Summary Judgment.]

26. 42 U.S.C. § 2000e–2(h) provides in relevant part:

### B. The Title VII Claims

Plaintiff also alleged violations of Title VII of the Civil Rights Act of 1964. The district court granted summary judgment on the Title VII claims as to all comparators. Title VII provides in relevant part:

It shall be unlawful employment practice for an employer—

(1) to ... *discriminate against any individual with respect to his compensation,* terms, conditions or privileges of employment because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1) (emphasis added). The Act incorporates the EPA's exceptions to a pay discrepancy. 42 U.S.C. § 2000e–2(h).[26] Title VII differs from the EPA in two significant respects. First, Title VII contains no "establishment" requirement, *Marcoux v. Maine,* 797 F.2d 1100, 1104 (1st Cir.1986), and second, plaintiff must prove discriminatory intent. *Mitchell v. Jefferson County Bd. of Educ.,* 936 F.2d 539, 546 (11th Cir.1991).

We utilize the *McDonnell Douglas Burdine* framework when analyzing the parties' burdens in gender-based wage discrimination claims. *Miranda,* 975 F.2d at 1528. *McDonnell Douglas* instructs that:

The plaintiff first has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. The burden then shifts to the defendant to 'articulate some legitimate nondiscriminatory reason' for the alleged discrimination. If the defendant produces such a reason, the plaintiff must then prove that the legitimate reason offered was a mere pretext for an illegal motive.

*Miranda,* 975 F.2d at 1528, *citing McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The burden of proof remains at all times with the plaintiff. *Texas Dept. of Community Affairs*

It shall not be an unlawful employment practice ... for any employer to differentiate on the basis of sex in determining the amount of wages or compensation paid to be paid to employees ... if such differentiation is authorized by the provisions of section 206(d) of Title 29.

v. *Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

The absence of an establishment requirement permits the plaintiff to make a Title VII prima facie case on a showing that she is female and her job was substantially similar to higher paying jobs occupied by males. *Miranda*, 975 F.2d at 1529. Clearly, if plaintiff makes a prima facie case under the EPA, she simultaneously establishes facts necessary to go forward on a Title VII claim. *EEOC v. White & Sons Enterps.*, 881 F.2d 1006, 1008, 1010 (11th Cir.1989). The standard for "similarity" in Title VII cases is relaxed, *Miranda*, 975 F.2d at 1526, and defendant's burden in rebutting the *prima facie* case is "exceedingly light." *Perryman v. Johnson Products, Co.*, 698 F.2d 1138, 1142 (11th Cir.1983). If defendant meets his burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case." *Burdine*, 450 U.S. at 256 n. 10, 101 S.Ct. at 1095 n. 10.

Plaintiff must then demonstrate that the employer's "legitimate" reason was in fact, pretextual. Courts have long recognized that an employer's true motivations are especially difficult to establish, making such factual determinations "generally unsuitable for disposition at the summary judgment stage." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir.1993); *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). At summary judgment, plaintiff's burden is simply to raise a genuine factual question as to the existence of pretext. "The plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie case." *Hairston*, 9 F.3d at 921; *Burdine*, 450 U.S. at 256 n. 10, 101 S.Ct. at 1095 n. 10 ("Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.") Summary judgment is appropriate when evidence of discriminatory intent is totally lacking. *Id.* This will seldom be the case when the "elusive factual question" of intentional discrimination is involved. *Id.*

## GROUP 1 COMPARATORS

### 1. The Prima Facie Case

Defendants concede that plaintiff can make out a *prima facie* case of discrimination in pay as compared to Beranek, Zimmerman, and Johnson.

### 2. The Legitimate, Non-discriminatory Reason

The district court accepted defendants' argument that the disparity was attributable to a factor other than sex; defendants allegedly paid these men more money than plaintiff for substantially similar work because their salaries were set by the government as part of contracts with Advance. We agree that defendants met their "exceedingly light" burden of production on this issue.

### 3. Pretext

Granting summary judgment, the district court ruled that plaintiff failed to present any evidence of pretext. We disagree. While defendants argued that Advance did not set the comparators' salaries, evidence supports Mulhall's contention that Advance did set their salaries acting through plaintiff as the vice-president for administration responsible for preparing bids and winning contracts. Fulfilling her responsibilities placed Mulhall in the unenviable position of creating a competitive bid that included salaries for her subordinates that were higher than her own. The government only "set the salaries" to the extent that it selected the most favorable bid taking all factors into account. Further evidence of Advance's role in setting the project managers' salaries is found in their response to another job offer received by Beranek in 1990. Advance's president immediately raised Beranek's salary $12,000 for a total of $70,000 (approximately $20,000 more than plaintiff's base pay). Whereas the government reimbursed Advance for Beranek's original $58,000 in this cost-plus account, Advance unhesitatingly assumed responsibility for the additional $12,000.

Defendants rely on a Seventh Circuit case for the proposition that the mere fact that a supervisor is paid less than her subordinates

does not indicate an unlawful wage disparity. *Riordan v. Kempiners,* 831 F.2d 690, 698 (7th Cir.1987). That case is distinguishable because the plaintiff there was a civil service worker who compared her pay to those of private sector salesmen. Here, all employees work in the private sector, renowned for flexibility in wage setting. While we certainly do not go so far as to hold that an unlawful wage disparity exists whenever a supervisor is paid less than her subordinates, we have no difficulty agreeing that plaintiff can survive summary judgment by pointing to the true nature of Advance's relationship with the comparators as proof of defendants' intentional discrimination. Accordingly, we reverse summary judgment on plaintiff's Title VII claims as they relate to Group 1 comparators.

### GROUP 2 COMPARATOR

#### 1. The Prima Facie Case

The district court found that plaintiff failed to make a prima facie case as to comparator William Hill, the president of ICA, because her position and his were not substantially similar. In Part III.A., *supra,* we agreed that plaintiff failed to meet the EPA's strict standard on this issue. Here, however, we review the evidence under Title VII's relaxed requirement. Because the record is devoid of evidence regarding the amount of time and effort Hill actually expended on investigative supervision, and the extent to which that supervision entailed personal investigative experience rather than generalized supervisory skills, we believe plaintiff raised a genuine issue of material fact regarding the similarity of the positions for the purposes of a Title VII suit.

#### 2. The Legitimate Non-discriminatory Reason

Defendants assert, and the district court agreed, that the pay discrepancy is explainable because Advance hired Hill to start up a new business and he had different skills. Agreeing that defendants met their burden of production, we move forward.

#### 3. Pretext

We have already held that the alleged difference between starting up a new business and creating business by preparing and retaining contracts is not a factor other than sex that totally explains Hill's higher salary. Plaintiff argues that defendants' explanation is pretextual—that it fails to explain the $26,000 to $27,000 discrepancy in their base pay at a time when Hill's operations cost Advance hundreds of thousands of dollars and Mulhall's profit for the company exceeded five hundred thousand dollars per year. In light of defendants admitted practice of assigning salaries based upon consideration of the employee's contributions to the company, the striking gap in Hill's and Mulhall's earnings on behalf of the company, and the significant difference in their salaries, we believe plaintiff has established pretext sufficiently to survive a motion for summary judgment.

### GROUP 3 COMPARATOR

#### 1. The Prima Facie Case

Because we have already determined that plaintiff made out a prima facie case on her Equal Pay Act claims as they relate to Larry Nelson, we also hold that she did so for the purposes of Title VII.

#### 2. The Legitimate Non-discriminatory Reason

Defendants argued to the district court that Nelson's ten year seniority constitutes a legitimate non-discriminatory explanation for the difference in Mulhall's and Nelson's pay. Neither defendants nor the court relied on the "seniority system" defense to the EPA because that defense requires a formal seniority structure. *Morgado v. Birmingham–Jefferson County Civil Defense Corps.,* 706 F.2d 1184, 1189–90 (11th Cir.1983), *cert. denied,* 464 U.S. 1045, 104 S.Ct. 715, 79 L.Ed.2d 178 (1984). Instead, the district court's ruling on behalf of defendants rested on "a factor other than sex," to wit, seniority. *See e.g., Blocker v. AT & T Technology Systems,* 666 F.Supp. 209, 213–214 (M.D.Fla. 1987) (citing cases). Applying the factor other than sex defense broadly, we agree that defendants adequately raised a legitimate non-discriminatory reason for the pay disparity on a motion for summary judgment.

#### 3. Pretext

While seniority explains some of the disparity in pay between Mulhall and Nelson, it

does not explain the disparity in pay attributable to Advance's reclassifying the controller position from level IV to level VII when many of the controller's functions were assigned to plaintiff. Also troubling is defendants' contention that had plaintiff remained with Advance, and had she continued to receive regular pay increases similar to those she received during her employment, "her salary would likely have surpassed Nelson's salary." [Defendant's Motion for Summary Judgment at 34 n. 58.] At most, this raises a genuine issue of material fact requiring trial. Furthermore, we have previously rejected a similar rationalization for disparate pay. In *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571 n. 5 (11th Cir.1993) we stated, "[a] defendant cannot argue that it should escape liability [under Title VII] because it is steadily decreasing a sex-based disparity. The statute contemplates that discriminatory behavior will immediately be corrected."

We reverse summary judgment for defendants on the Title VII claims as they relate to the controller position because plaintiff's evidence supports her allegation that defendants' explanation is merely pretextual.

### GROUP 4 COMPARATORS

#### 1. The Prima Facie Case

The district court held, and we agree, that plaintiff established a prima facie case as it relates to the Group 4 comparators.

#### 2. The Legitimate, Non-discriminatory Reason

We have already decided that defendants failed to establish as a matter of law that the comparators were paid more solely because their salaries were negotiated as a part of the sale of their business to defendants.[27] Their argument was sufficient, however, to meet the lighter burden of production required under the Title VII standard.

#### 3. Pretext

Plaintiff searched for evidence in support of pretext through comparison of her profit making record with those of the comparators.

27. *See supra* Pt. III.A.

The tremendous disparity between her salary and those of the comparators, when contrasted with her high earnings on behalf of Advance and the lesser contributions of comparators Trumbull and Massimei suggests that something was awry. However, Trumbull's contractual salary was fixed at $80,000 as part of the purchase price of his company. When his contract term ended in 1992 his salary dropped to $46,000—an amount below Mulhall's 1991 salary. Advance clearly adjusted Trumbull's salary downward in keeping with his performance as soon as contractually free to do so. This negates Plaintiff's claim of pretext as to this comparator.

Similarly, Mulhall outperformed Massamei during two of the three years under comparison and his third year earnings exceeded Mulhall's only because of a large temporary account. However, in contrast with Trumbull's precipitous reduction in salary when his contract ended, Massamei's career with Advance culminated in his promotion to President in 1991. Meanwhile, Plaintiff's salary was never adjusted to reflect her superior earnings on behalf of the company.

As to comparator Gregg, we note that his earnings exceeded plaintiff's by between $102,900 and $146,635 for four of the five years under comparison, but that plaintiff outperformed Gregg by $135,500 during the remaining year. Gregg earned approximately $20,000 more than Plaintiff each year. He resigned prior to the 1990 salary review, but up to that time Plaintiff's salary was never adjusted to minimize the discrepancy in their compensation in spite of her performance.

Further supporting pretext as to comparators Massamei and Gregg is the fact that both were awarded bonuses as vice presidents of profit centers, while Mulhall was never so compensated despite her earning record on the government contract profit centers. For purposes of summary judgment, we find that Plaintiff produced evidence of pretext as it relates to comparators Massamei and Gregg, but not to comparator Trumbull.

#### Summary—Title VII Claims

We reverse the district court's grant of summary judgment on the Title VII claims

as they relate to the comparators in Groups 1, 2, and 3, and as to Group 4 comparators Massamei and Gregg because plaintiff established a prima facie case as to these comparators and responded to defendants' legitimate non-discriminatory explanations for the pay discrepancies with evidence of pretext sufficient to raise a genuine factual question appropriate for consideration by a jury. We affirm the district court's grant of summary judgment as to Group 4 comparator Trumbull.

## IV. CONCLUSION

For all of the foregoing reasons, we AFFIRM summary judgment for defendants on the state tort claims, the promotion claim, and the claims arising under the Civil Rights Act of 1991. We VACATE summary judgment for defendants and REMAND for further consideration those claims arising under the Equal Pay Act and the Title VII of the Civil Rights Act of 1964.