[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 13-14742
Argument Calendar

————————————————

D.C. Docket No. 4:12-cv-00612-RH-CAS

JILL BLACKMAN,

Plaintiff - Appellant,

versus

FLORIDA DEPARTMENT OF BUSINESS
AND PROFESSIONAL REGULATION,

Defendant - Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Florida

————————————————

(February 19, 2015)

Before ED CARNES, Chief Judge, and JORDAN and ROSENBAUM, Circuit
Judges.

PER CURIAM:

Jill Blackman appeals the district court's grant of summary judgment in favor of the Florida Department of Business and Professional Regulation on her claims of gender-based salary discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e)-2(a); the Florida Civil Rights Act, Fla. Stat. § 760.10; and the Equal Pay Act of 1963, 29 U.S.C. § 206. The district court ruled that Ms. Blackman failed to make out a *prima facie* case under Title VII or the EPA for all but one of her alleged comparators, and that the DBPR proved legitimate, nondiscriminatory reasons for the challenged pay disparities. Following a review of the record, and with the benefit of oral argument, we affirm.[1]

## I

After starting as a typist for the DBPR in 1986, Ms. Blackman worked her way up the organization in the Division of Pari-Mutuel Wagering. In 1998, she earned a bachelor's degree in political science and a certificate in public administration. Approximately four years later, she was promoted to her first management position in the DPMW as a Senior Management Analyst II.[2]

---

[1] "The Florida Civil Rights Act was patterned after Title VII, and Florida courts have construed the [A]ct in accordance with decisions of federal courts interpreting Title VII. . . . As such, the district court did not independently analyze [Ms. Blackman's] Florida Civil Rights Act claims, and they will not be independently analyzed in this opinion." *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004).

[2] Although Ms. Blackman testified that she first started supervising others as a Senior Management Analyst II, the record indicates that she may have assumed her first management position as early as 2000 as a Licensing Administrator. *See* D.E. 18-1 at 5.

2

When her predecessor, Mr. Royal Logan, retired in 2006, Ms. Blackman was promoted to Bureau Chief of Operations.  Upon being promoted, she received a 14% raise to a salary of approximately $57,700.  *See* D.E. 18-1 at 18.  Soon thereafter, she received a legislatively-mandated 3% raise, bringing her salary to approximately $59,500.  *Id.*  In 2007, however, the state stopped providing legislatively-mandated annual raises, and Ms. Blackman's salary remained static until January of 2012, when she received a 3.4% discretionary salary increase to $61,500.  *Id.*

In July of 2010, Ms. Blackman viewed a public website with state salary information and learned that the DBPR was paying her less than two male DPMW bureau chiefs and one of her male subordinates.  Believing that the differences stemmed from gender discrimination, Ms. Blackman submitted a charge of discrimination to the Florida Commission on Human Relations and the Equal Employment Opportunity Commission.  After receiving a right to sue letter from the EEOC, she filed a complaint in Florida state court. The DBPR removed the case to federal district court.

Ms. Blackman alleged that she was being paid less than five male employees on the basis of her gender in violation of Title VII, the FCRA, and the EPA: (1) Mr. Logan, the former Chief of Operations and her predecessor; (2) Mr. Steven Kogan, the Chief of Investigations; (3) Mr. Dewayne Baxley, the Chief Auditing

3

Officer; (4) Mr. John Karr, the Regional Program Administrator and her subordinate; and (5) Mr. Joel White, a Special Projects Advisor to the DBPR Secretary.   The district court granted summary judgment to the DBPR.   It concluded that Ms. Blackman failed to establish a *prima facie* case of discrimination because her male colleagues, other than Mr. Logan, were not proper comparators under Title VII or the EPA due to differences in their job responsibilities and skill sets.   In addition, the district court ruled that the DBPR had established legitimate, nondiscriminatory reasons for the pay disparities between Ms. Blackman and her male colleagues, including Mr. Logan.

## II

We review *de novo* a district court's order granting summary judgment, "viewing all the evidence, and drawing all reasonable inferences, in favor of the non-moving party."  *Vessels v. Atl. Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005).   Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   "Speculation or conjecture cannot create a genuine issue of material fact, and a mere scintilla of evidence in support of the nonmoving party cannot overcome a motion for summary judgment."  *S.E.C. v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014) (internal quotation marks omitted).

**III**

We analyze claims under the EPA using a burden-shifting framework similar to that employed in the Title VII context.  To establish a *prima facie* case under the EPA, a plaintiff "must show that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  *Arrington v. Cobb Cnty.*, 139 F.3d 865, 876 (11th Cir. 1998) (internal quotation marks omitted).  Although "the plaintiff need not prove that her job and those of her comparators are identical[,] . . . the standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high."  *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 592 (11th Cir. 1994) (internal quotation marks and alterations omitted).  If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to prove "by a preponderance of the evidence . . . that the [pay] differential is justified by one of four exceptions set forth in the EPA . . . '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'"  *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) (quoting 29 U.S.C. § 206(d)(1)).  If the employer demonstrates that "the factor of sex provided *no basis* for the wage differential," the plaintiff must show that the proffered explanation is either "pretextual or offered as a post-event

5

justification for a gender-based differential." *Id.* (internal quotation marks omitted) (emphasis in original).

On appeal, Ms. Blackman argues that the district court erred in granting summary judgment on her EPA claims with respect to Messrs. Baxley, Kogan, and Karr. Our review of the record, however, indicates that the district court did not err in ruling that Ms. Blackman failed to establish a *prima facie* case with respect to Messrs. Baxley, Kogan, and Karr. As to Mr. Baxley, even assuming that he was a proper comparator under the EPA—and on this record, we conclude that he was not—the district court did not err in ruling that the DBPR had a legitimate, nondiscriminatory explanation for the salary differential between him and Ms. Blackman, and that Ms. Blackman failed to introduce sufficient evidence to create an issue of material fact as to whether this explanation was pretextual.

Although Ms. Blackman bore the burden of demonstrating that the "jobs at issue are substantially similar," *Arrington*, 139 F.3d at 876, aside from an organizational chart showing that Mr. Karr—a DPMW Regional Program Administrator—was her subordinate, she introduced almost no evidence regarding the "skills and qualifications actually needed to perform [Mr. Karr's] job[ ]." *Mulhall*, 19 F.3d at 592 (internal quotation marks omitted). Nor did she provide any evidence demonstrating that the actual content of her job and Mr. Karr's job were substantially similar. *See Arrington*, 139 F.3d at 876 ("[T]he controlling

6

factor in the court's assessment of whether two jobs are substantially equal must be actual job content."). Ms. Blackman merely testified, without providing any specifics, that Mr. Karr "is not required to do the same level of work [nor does he] have the same level of responsibility." D.E. 20-1 at 76. But such conclusory testimony alone is insufficient to create a genuine issue of material fact. *See Monterosso*, 756 F.3d at 1333 ("Speculation or conjecture cannot create a genuine issue of material fact[.]"). By leaving the district court in the dark regarding the content of Mr. Karr's position *vis-à-vis* her position, Ms. Blackman failed to establish a *prima facie* case under the EPA. This is particularly so given the DBPR's unrebutted evidence that, "[e]ven though Mr. Karr is [subordinate to] Mrs. Blackman in the organizational structure, their duties are not similar." D.E. 18-1 at 7 (noting as an example that Mr. Karr, unlike Ms. Blackman, "routinely travels to the pari-mutuel facilities in the Southern Region to address personnel issues, scheduling issues, compliance issues, and to meet with track representatives"). And unlike Ms. Blackman, Mr. Karr is responsible for inspecting DBPR facilities to ensure they are adequately maintained and that the animals are treated humanely and according to law. *See id*. These facts militate against Ms. Blackman's argument that her job was similar to Mr. Karr's.[3]

---

[3] Ms. Blackman's concern with respect to Mr. Karr appears to be that, although he is her subordinate, his salary is higher than hers. When asked at her deposition whether she should be paid the same as Messrs. Baxley and Kogan, Ms. Blackman responded: "Philosophically, yes.

Our dissenting colleague believes that Mr. Karr and Ms. Blackman are appropriate comparators under the EPA in part because Ms. Blackman indirectly supervised the same employees that Mr. Karr did. We respectfully disagree. Police sergeants and police lieutenants do not have substantially similar jobs just because they both supervise patrolmen and patrolwomen—sergeants directly, and lieutenants indirectly.

The dissent also asserts that Mr. Karr and Ms. Blackman had substantially similar jobs because Mr. Karr had the same responsibilities as Ms. Blackman, just on a smaller scale. But, as we explained above, the record establishes that their jobs were different in kind, and not merely degree; and it is the actual job content that controls. *See Arrington*, 139 F.3d at 876.

Accordingly, we conclude that Ms. Blackman failed to meet her burden of demonstrating that, as to Mr. Karr, the "jobs at issue [were] substantially similar." *Id.*

Ms. Blackman similarly failed to introduce sufficient evidence to support a *prima facie* case with respect to Mr. Kogan.[4] Ms. Blackman argues that she

But, again, I feel that more importantly an individual who reports directly to me who is not required to do the same level of work or have the same level of responsibility as me should not be making more than me." D.E. 21-1 at 76. We note that Ms. Blackman was not the only bureau chief being paid less than Mr. Karr. Messrs. Baxley and Kogan—both of whom are males—were also paid less. *See* D.E. 23-5 at 2, 5-6.

[4] Our dissenting colleague agrees that Mr. Kogan and Ms. Blackman are not proper comparators under the EPA.

8

satisfied her burden by introducing (1) an organizational chart showing the "hierarchical 'parity' between the respective Bureau Chiefs," (2) testimony from Mr. Kogan demonstrating that he considered Ms. Blackman his "peer," and (3) an email from Joe Dillmore, DPMW Deputy Director, to the heads of all six DPMW divisions referring to the bureau chiefs  as "key staff" capable of fulfilling director duties.  *See* Appellant's Br. at 18-20.  This evidence, however, does not create a genuine issue of material fact as to the similarity of the actual content of the jobs.  Although Mr. Kogan and Ms. Blackman are both bureau chiefs, it is the "actual job content," not job titles or job descriptions that is controlling.  *See Arrington*, 139 F.3d at 876.  *See also Mulhall*, 19 F.3d at 592 ("Job titles are a factor for consideration, but are not dispositive.").

Ms. Blackman does not dispute that Mr. Kogan has investigative skills and that his bureau conducts investigations.  She also admits that she does not have Mr. Kogan's investigative skills.  See D.E. 20-1 at 38.  Because "investigative knowledge [is] more than an incidental part of [Mr. Kogan's] position" as Chief of Investigations, the district court properly determined that he is not a comparator to Ms. Blackman under the EPA.  *See Mulhall*, 19 F.3d at 593. [5]

---

[5]  Implicitly acknowledging the insufficiency of this evidence, Ms. Blackman asserts that Carolynn Trabue, the highest earning DPMW bureau chief, is not a proper comparator under the EPA—despite her "hierarchical parity" with the other bureau chiefs, and despite her inclusion on the "key staff" email from Mr. Dillmore—because of the specific skill set required for her position as Chief of Slots.

As for Mr. Baxley, Ms. Blackman introduced scant evidence to show that his job was substantially similar to her own.  In her opposition to the DBPR's motion for summary judgment, Ms. Blackman attempted to demonstrate that her job as Chief of Operations was substantially similar to the jobs of the other DBPR bureau chiefs, including Mr. Baxley, but pointed only to (1) an organizational chart showing the "hierarchical 'parity' between the respective Bureau Chiefs," (2) testimony from Mr. Kogan demonstrating that he considered Ms. Blackman his "peer," (3) an email from Mr. Dillmore referring to the bureau chiefs as "key staff," *see* D.E. 23 at 8-10, and (4) job descriptions for the Chief of Operations and the Chief of Auditing, *see* D.E. 23-15, 23-16.  And when the district court asked Ms. Blackman's counsel at the hearing on summary judgment to explain how the jobs were similar, he had trouble doing so.  *See* D.E. 39 at 9-13.

Our dissenting colleague concludes that this evidence is sufficient to establish that Mr. Baxley is an appropriate comparator under the EPA.  We again respectfully disagree.  As we have noted, our cases require us to examine the "actual job content," not just job titles and descriptions.  *Arrington*, 139 F.3d at 876.  Moreover, Ms. Blackman's testimony belies her claim that her job was substantially similar to Mr. Baxley's.  When asked why she compared herself to Messrs. Baxley and Kogan and Ms. Trabue, Ms. Blackman responded that "we are all chiefs."  D.E. 20-1 at 36.  Ms. Blackman further testified that Mr. Baxley, as

10

Chief of Auditing, oversaw auditors and conducted audits, and admitted that experience in conducting audits was a skill set she did *not* possess. *Id.* at 38-39. It is difficult to see how Ms. Blackman can argue that each bureau chief has substantially the same job, on the one hand, while on the other hand admitting that each bureau chief possessed a distinct skill set. On this record, we conclude that Ms. Blackman failed to create a genuine issue of material fact with respect to the similarity of the jobs. *See Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992).

Even assuming that Ms. Blackman raised a genuine issue as to whether Mr. Baxley was a proper comparator under the EPA, the DBPR offered sufficient evidence to show that the differential in pay was based on Mr. Baxley's "auditing experience, management experience, and his education in accounting and business administration." D.E. 18-1 at 9.[6] It is undisputed that Mr. Baxley worked in a managerial capacity for the DPWM for 13 years before becoming a bureau chief, far longer than Ms. Blackman. During this time, Mr. Baxley received legislatively-mandated annual raises (which were not gender-based) on a higher base salary than Ms. Blackman. Mr. Baxley, moreover, has two bachelor's degrees, one in accounting and another in business administration, both of which

---

[6] As of July of 2010, Mr. Baxley was earning $62.09 more than Ms. Blackman per pay period. *See* D.E. 23-5 at 2, 5 (Mr. Baxley was earning $2,349.41 per pay period, and Ms. Blackman was earning $2,287.32 per pay period).

11

were relevant to his work as Chief Auditing Officer.  Although Ms. Blackman has a single bachelor's degree in political science, it is unrelated to her position as Chief of Operations.  These differences in experience and education between Mr. Baxley and Ms. Blackman sufficiently demonstrate that their salary differential was based on factors other than gender.[7]

Ms. Blackman offered no evidence to create a triable issue that these reasons were pretext for discrimination.  *See Irby*, 44 F.3d at 956 (explaining that "[e]xperience is an acceptable factor other than sex" that may be rebutted by a plaintiff showing that she had "equal or more experience of the same type").  On appeal, Ms. Blackman instead argues that the DBPR waived its gender-neutral reasons by failing to plead them below.

We reject this argument.  Because Ms. Blackman was on notice that the DBPR planned to assert legitimate, nondiscriminatory reasons for its actions, *see* D.E. 1-1 at 15, the district court did not abuse its discretion in considering the DBPR's gender-neutral reasons.  *See Mitchell v. Jefferson Cnty. Bd. of Educ.*, 936 F.2d 539, 544 (11th Cir. 1991).  As Ms. Blackman offers no substantive arguments for her contention of pretext on appeal, we affirm the district court's grant of summary judgment to the DBPR on Ms. Blackman's EPA claims.

---

[7] At the time of his promotion to Chief Auditing Officer, Mr. Baxley received only a 5% raise over his then-current salary.  Ms. Blackman, by comparison, received a 14% raise at the time of her promotion to Chief of Operations.  *See* D.E. 18-1 at 18, 25.

12

## IV

In disparate treatment cases under Title VII based on circumstantial evidence, we usually apply the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Although Title VII has a "relaxed standard of similarity between male and female-occupied jobs[,]"*Miranda*, 975 F.2d at 1526, to make out a *prima facie* case of pay discrimination under Title VII, the plaintiff must show by a preponderance of the evidence that "the employee she identifies as a comparator [is] similarly situated [to the plaintiff] in all relevant respects."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (internal quotation marks omitted).  "[I]f the plaintiff makes out a prima facie case, the defendant must produce a legitimate, nondiscriminatory reason to explain the challenged action."  *Arrington*, 139 F.3d at 873.  The employer's burden is "exceedingly light."  *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir. 1994) (internal quotation marks omitted).  "If [the] defendant meets [its] burden of production, the presumption raised by the prima facie case is rebutted and drops from the case," unless the plaintiff can "demonstrate that the employer's legitimate reason was in fact, pretextual."  *Mulhall*, 19 F.3d at 598 (internal quotation marks omitted).

We affirm the district court's grant of summary judgment in favor of the DBPR on Ms. Blackman's Title VII claims with respect to Messrs. Baxley, Kogan, and Karr.  As discussed above with respect to her EPA claims, Ms. Blackman

13

failed to create a genuine issue of material fact as to the similarity of her job and the jobs held by Messrs. Baxley, Kogan, and Karr, even under Title VII's relaxed standard of similarity, because she introduced insufficient evidence concerning the actual content of the jobs held by these individuals. Nor did she introduce any evidence to show that the DBPR's legitimate, nondiscriminatory reasons for the difference in her salary and Mr. Baxley's salary were pretexts for discrimination.[8]

We agree with the district court that Mr. Logan, Ms. Blackman's predecessor as Chief of Operations, was a proper comparator under Title VII. We also agree with the district court, however, that the DBPR provided legitimate, nondiscriminatory explanations for the salary differential between Mr. Logan and Ms. Blackman. First, the record indicates that Mr. Logan, who held a bachelor's degree in business management and a master's degree in management and supervision, had better qualifications for the position than Ms. Blackman, who only had a bachelor's degree in political science. Second, and more importantly, Mr. Logan, unlike Ms. Blackman, benefitted from legislatively-mandated annual raises (which were gender-neutral) during his entire 13-year tenure as Chief of Operations. As a result, Mr. Logan, who was making a salary of $52,780 in 2000, was earning $72,000 at the time of his retirement in July of 2006.

---

[8] Because she does not advance on appeal any arguments with respect to Mr. White, Ms. Blackman has waived any argument that he was a proper comparator under Title VII.

14

Ms. Blackman concedes that it was not discriminatory for her to make less than Mr. Logan when she first started as Chief of Operations.  *See* D.E. 20-1 at 48. Rather, she argues that her salary in 2012 should have come close to Mr. Logan's 2006 salary, because his salary increased from $52,780 to $72,000 over the course of six years—approximately the same amount of time that Ms. Blackman held the same position.  *See* Appellant's Br. at 24.  But, as the DBPR correctly argues, Ms. Blackman's salary would have been closer to Mr. Logan's salary at retirement if Ms. Blackman had benefitted from annual legislatively-mandated raises from 2007 to 2012.  Indeed, had Ms. Blackman received these annual pay raises, as Mr. Logan did, she would have been making approximately $71,000 at the time she filed her complaint in 2012 (assuming a 3% annual increase).[9]  In short, the salary difference is a function of the annual raises (and compound interest) from which Mr. Logan benefited, and Ms. Blackman did not.

Because Ms. Blackman introduced no evidence to demonstrate that the DBPR's legitimate, nondiscriminatory reasons for the pay differential between her and Mr. Logan were pretextual, we affirm the district court's grant of summary judgment in favor of the DBPR on this claim.

---

[9] We arrive at this estimate using an annual compound interest formula, where the amount of money earned after 6 years of annual 3% raises equals the starting salary of $59,500 multiplied by $(1.03)^6$.

## V

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the DBPR on all of Ms. Blackman's claims.

**AFFIRMED.**

ROSENBAUM, Circuit Judge, dissenting.

Jill Blackman has presented more than enough evidence for a jury reasonably to find that, for years, the Florida Department of Business and Professional Regulation ("DBPR") has paid her less than comparably situated male employees for no legitimate reason that stands up to any scrutiny. She has established a *prima facie* case that men with substantially similar jobs were paid more for their work than she was for hers, and, based on the evidence submitted in connection with DBPR's motion for summary judgment, a jury could reasonably and easily find that DBPR's proffered legitimate reasons for the pay differentials are internally inconsistent and are contradicted by the evidence. For these reasons, I respectfully dissent from the Court's affirmance of summary judgment for DBPR in this case.

## I.    Background Facts

As the Court notes, the Equal Pay Act and Title VII analyses involve, to different degrees, a comparison of Blackman's duties with those of her chosen comparators and an evaluation of any evidence that might suggest that DBPR's proffered reasons for paying Blackman less than any similarly situated colleagues are pretextual. Both of these tasks require knowledge of the details of the duties and employment histories of Blackman and her chosen comparators. Towards that

end, this section sets forth the relevant facts about Blackman and each of her proposed comparators.

## A.    *Jill Blackman*

Jill Blackman holds a Bachelor of Science degree in political science with a minor in criminology and a certificate in public administration.[1]  She began working for the State of Florida as a full-time, career-service employee in February 1986 and started working at DBPR as a data-entry operator in 1988.  Blackman has worked for her entire career in DBPR's Division of Pari-Mutuel Wagering ("PMW") and has held a management position since 2000.

She was promoted to the position of Chief of Operations of PMW in September 2006.  Throughout the two years before her promotion, Joe Dillmore, the Deputy Director of PMW, advised Blackman that she was the "heir apparent" to and most suitable person for the position and that she would replace her then-supervisor, then-Chief of Operations, Royal Logan, when he retired.  Blackman was well-versed in everything that had to do with the Chief-of-Operations position; others described her as the "knowledge champion," the "data steward," and the "subject matter expert" for the Operations division.

---

[1] Florida State University, from which Blackman obtained her degree, offers a certificate in public administration and describes the purpose of its certificate as "provid[ing] a greater degree of specialization in a chosen area." http://coss.fsu.edu/prospective-students/undergraduate-minors (last visited Feb. 4, 2015).  According to FSU's website, the public-administration certificate covers topics including "[a]dministrative law, budgets and finances in managing public affairs, civic and non-profit management, local government administration, emergency management, and public administration in American society." *Id.*

From June 2004 until her promotion, Blackman received a base pay of $1,948.67 every two weeks.  Upon her promotion in September 2006, Blackman's pay increased to a base pay of $2,220.70.  Shortly thereafter, in October 2006, a legislative raise for Florida employees bumped Blackman to a base pay of $2,287.32, an annual salary of approximately $59,700.  This is where her salary stayed until she received a "merit-based" pay increase in December 2011 after filing the Equal Employment Opportunity Commission ("EEOC") charge related to this case, which brought her base pay to $2,365.38.

As Chief of Operations, Blackman is responsible for ensuring that the day-to-day operations of races are conducted legally.  She oversees all of the licensing for PMW, including the occupational licensing, the permit-holder licensing, the annual-operating-date licensing, the card-room licensing, and the slot-machine licensing.  The implementation of slot-machine operations and regulations was new to PMW at the time that Blackman was promoted, so Blackman took on considerably more job responsibility—approximately 25% more—than her predecessor, Royal Logan.

Blackman also oversees all blood-sample collection and drug testing for racing animals.  She is responsible for supervising all individuals and field staff involved in the actual collection of the samples, the chain of custody, and the shipments to the University of Florida College of Medicine's Racing Laboratory,

19

where the samples are analyzed for prohibited substances. All testing results are sent to Blackman, and the Office of Operations handles the results under her supervision.

The Office of Operations is the largest bureau in PMW, and Blackman supervises more employees, both directly and indirectly, than any other Chief in PMW. Six employees report directly to Blackman, including John Karr, a Regional Program Administrator. Blackman also indirectly supervises at least seventy other employees.

## B.    John Karr

John Karr has a high-school diploma and began working for the State of Florida in 1979 part time as a ticket taker at a facility in Dania. He became a full-time, career-service employee as an auditor in 1986. In or around 1991, Karr became a regional manager for auditing.

While Joe Dillmore attested that Karr's management position "has been the same . . . (putting aside organizational restructuring and renaming of positions) since [1991]," other evidence in the record clearly contradicts this statement. For example, Karr testified that in 2000, he was promoted to be the Southern Regional Manager, a position in which he was in charge of both auditing and investigations for PMW. At later points, which are discussed below, auditing and investigations

20

were broken off into their own sections within PMW, headed by their own chiefs. As a result, Karr ceased supervising auditing and investigations.

In 2004, under the title of Southern Regional Manager, Karr made a base salary of $2,268.63 per two-week pay period. He also participated in interviewing and hiring Steven Kogan to work beneath him as an investigations supervisor. At that time, six investigators reported to Karr.

As pari-mutuel wagering expanded in Florida—new tracks opened up and card rooms became larger—Karr realized that DBPR needed more investigators, and he decided that DBPR required a completely separate investigations bureau. So, in 2006, Karr and Dillmore agreed to promote Kogan to Chief of Investigations. Shortly thereafter, Blackman was promoted to Chief of Operations and became Karr's supervisor. At that time, Karr still made a base pay of $2,268.63, but in October 2006, a raise bumped him to a base pay of $2,420.81, an annual salary of approximately $63,100.

Currently, Karr is the Regional Program Administrator for PMW. In this position, Karr has less responsibility than he did when he served as the Southern Regional Manager, in that he no longer supervises auditing or investigations, and he supervises fewer people.

Karr now directly supervises only two people—one regional manager responsible for equine racing and one regional manager responsible for dog racing

and jai alai.  He also supervises approximately 68 chief inspectors and licensing employees indirectly.  As the Regional Program Administrator, Karr is responsible for facilities inspections to ensure that the facilities are adequately maintained and that the animals are treated humanely and lawfully.  In addition, he "routinely travels to the pari-mutuel facilities in the Southern Region to address personnel issues, scheduling issues, compliance issues, and to meet with track representatives."

### C.    DeWayne Baxley

DeWayne Baxley has a Bachelor of Science degree in Accounting and a Bachelor of Science degree in Business Administration, and he began working for the State of Florida in 1990.  In April 1992, Baxley started working at DBPR in PMW as a senior auditor, a position in which he managed other auditors, but he left a little over a year later, in July 1993, to take another state position with a different entity in a different location.  Baxley returned to PMW in November 1994 as an auditor supervisor.  In about July 2004, Baxley made a base salary of $2,096.87 per pay period, and a raise in October 2006 increased his base pay to $2,237.53.

Almost a year later, in about September 2007, Baxley was promoted to Chief Auditing Officer.  Upon his promotion, his base pay increased to $2,349.41 per pay period, an annual salary of approximately $61,300.  As the Chief Auditing

Officer, Baxley is essentially the chief of auditing for PMW.  He is responsible for ensuring that pari-mutuel, card-room, and slot-machine wagering are conducted in compliance with Florida statutes and the Florida Administrative Code.   He supervises annual compliance audits and auditing employees who reconcile pari-mutuel wagering pools to ensure patrons receive proper payouts.  Baxley serves as the main point of communication for the Office of Auditing, has full authority for all auditing issues, and performs "high level approval and decision making."

### D.     Steven Kogan

Steven Kogan has a high-school diploma and worked for a number of years in law enforcement before he began working for the State of Florida in 1994.  In 2004, he was interviewed and hired by Karr and another individual to work as an investigations supervisor for PMW.  As an investigations supervisor, Kogan received a base pay of $1,589.46 per pay period until a raise in September 2005 increased his base pay to $1,729.01.  He reported directly to Karr and was responsible for working with and overseeing the investigations conducted by the investigators in the unit.  Kogan directly supervised seven investigators and two secretaries, about nine employees total.

In April 2006, PMW created the Chief-of-Investigations position and appointed Kogan to fill it.  With this promotion, Kogan's base pay increased to $2,298.85, and a raise shortly thereafter, in October 2006, increased it to

23

$2,367.82, an annual salary of approximately $61,800. He supervised the same employees and did basically the same work that he had done as an investigations supervisor.

As Chief of Investigations, Kogan oversees investigations and works with the investigators to make sure the investigations are done properly and to help them complete their assignments. The Investigations section seeks regulatory compliance for horse-racing, dog-racing, jai-alai, card-room, and slot-machine operations, and it ensures that permit holders and players follow the statutes and rules. Since 2006, the Office of Investigations has expanded, and Kogan now supervises three employees directly and approximately eighteen employees indirectly.

## II.    Equal Pay Act Claims

### A.    *Prima Facie Case*

Blackman has introduced sufficient evidence to support a *prima facie* case under the EPA, comparing her job to those of Baxley and Karr. Under the EPA, as the Court acknowledges, Blackman "need not prove that her job and those of the comparators are identical," but rather that the jobs require substantially similar skills, effort, and responsibility. *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 592 (11th Cir. 1994). Significantly, "[c]omparators' prior experience is not relevant to the 'substantially similar' inquiry." *Id.* In addition, the EEOC has

opined that in interpreting the terms "equal skill, equal effort, [and] equal responsibility" from the EPA, "the broad remedial purpose of the law must be taken into consideration."  29 C.F.R. § 1620.14(a).

### 1.    Blackman Compared to Karr

Karr qualifies as a proper comparator for Blackman under the EPA. Blackman supervises Karr in the Office of Operations, and Karr reports directly to Blackman.   The record reflects that Karr and Blackman supervise the same employees in the same area who are performing the same functions.   Karr supervises two regional managers directly—one responsible for equine racing and one responsible for dog racing and jai alai—and approximately 68 chief inspectors and licensing employees indirectly.   Blackman supervises, either directly or indirectly, all of the employees in the Office of Operations, including those who Karr supervises.  She is responsible for ensuring that all races are conducted in accordance with the law, and she is in charge of all licensing, blood-sample collection from racing animals (such as the ones collected by the regional supervisors for equine racing and dog racing, who report to Karr), and drug testing. Put simply, Blackman supervises at a higher level, is required to do more work, and has more responsibility than Karr.

Nor does DBPR's perfunctory allegation that "Mrs. Blackman's job duties are different from Mr. Karr's job duties" rebut these specific facts showing the

25

substantial similarity of the two positions.  To demonstrate the differences between

Blackman and Karr's duties, DBPR offers only the following:

> Mr. Karr is responsible for facilities inspections to ensure adequate maintenance and that the animals are treated humanely in accordance with Florida Statutes.  Mr. Karr also routinely travels to the pari-mutuel facilities in the Southern Region to address personnel issues, scheduling issues, compliance issues, and to meet with track representatives.  Mrs. Blackman does not typically travel to pari-mutuel facilities for these reasons.

Conspicuously absent from this description is any indication that Blackman is not

also responsible as a supervisor for facilities inspections to ensure compliance with

Florida law.  And, in fact, Blackman's position description shows that she is.  It

affirmatively states that she is responsible for "[c]oordinat[ing] ***all pari-mutuel***

***operations activities*** . . ." and that she [d]evelops and implements on-the-job

training procedures ***for all personnel involved [in] on-site pari-mutuel operations***

. . . ."  (Emphasis added).

As for DBPR's point about Karr's travels, once again, all of the reasons that

Karr travels to the Southern Region involve duties that Blackman is also and

ultimately responsible for.  Indeed, Blackman directly or indirectly supervises all

personnel in Operations; as far as scheduling goes, she "[c]oordinates all pari-

mutuel operations activities and plans work loads, work flows, deadlines, work

objectives, and time utilization of subordinate employees," one of whom is Karr;

and she is responsible for "the implementation of rules, policies, and procedures

26

applicable to conduct of pari-mutuel field operations, sample collections, and licensing . . . ." So, when DBPR's statement is closely reviewed, the only arguable real difference between Karr's position and Blackman's position, other than that Blackman has more responsibility than Karr and supervises him, is that Karr travels for the stated purposes, while Blackman apparently travels for other purposes.

But this trivial difference does not allow DBPR to escape the grasp of the EPA. Significantly, the EEOC has explained that, under the EPA, "differences in skill, effort or responsibility which might be sufficient to justify a finding that two jobs are not equal within the meaning of the EPA if the greater skill, effort, or responsibility has been required of the higher paid sex, do not justify such a finding where the greater skill, effort, or responsibility is required of the lower paid sex." 29 C.F.R. § 1620.14. If an employer could circumvent the protections of the EPA by merely piling more work onto its female employees than its male employees, the EPA would be meaningless. As the EEOC has stated, "[A] serious question would be raised where . . . an inequality [in pay], allegedly based on a difference in job content, is in fact one in which the employee occupying the job purportedly requiring the higher degree of skill, effort, or responsibility receives the lower

27

wage rate. . . ."[2]  29 C.F.R. § 1620.13(d); *see also Mulhall*, 19 F.3d at 591-92 (offsite project managers who reported to plaintiff and sought her approval were similarly situated to plaintiff for purposes of the EPA); *Riordan v. Kempiners*, 831 F.2d 690, 699 (7th Cir. 1987) (noting that while "the work of a supervisor and of the workers she supervises is necessarily different[,]" "an employer cannot avoid the [EPA] by the simple expedient of loading extra duties onto its female employees—unless it pays them more"); *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 917 (9th Cir. 1983).  Because Karr is responsible for the same DBPR operations as Blackman, just on a smaller scale, he is a proper comparator to Blackman under the EPA.  At the very least, Blackman has certainly raised a material issue of fact concerning whether Karr is a proper comparator—all that she needed to do to survive summary judgment on this issue.

2.    *Blackman Compared to Baxley*

---

[2] My colleagues in the Majority appear to take issue with Blackman's concern that Karr is paid more than she, even though he is subordinate to her.  *See* Maj. Op. at 7 n.3.  The Majority notes, "When asked at her deposition whether she should be paid the same as Messrs. Baxley and Kogan, Ms. Blackman responded: 'Philosophically, yes.  But, again, I feel that more importantly an individual who reports directly to me who is not required to do the same level of work or have the same level of responsibility as me should not be making more than me.'"  *Id.*  As the EEOC regulations show, however, Blackman's concern is a legitimate one under the EPA.  Moreover, the fact that Baxley and Kogan, who were both paid more than Blackman, were paid less than Karr is not relevant to the inquiry into whether Blackman's and Karr's positions were substantially similar—that is, whether the positions required substantially similar skills, effort, and responsibility.  While Karr's salary in comparison to those of Baxley and Kogan may be relevant to the pretext issue, that is a separate inquiry.  But, as explained below, the record contains sufficient evidence to raise a material issue of fact regarding pretext as it pertains to Blackman's salary relative to those of Karr and Baxley, even though Karr was paid more than Baxley.

28

Baxley is also a proper comparator for purposes of the EPA.  Blackman and Baxley are both Bureau Chiefs who report directly to Dillmore.  They are both required to do essentially the same work within their particular subject areas, including certain projects, such as rulemaking or rule review.  And they are also both considered "key staff" capable of fulfilling some Director duties.  Likewise, both Blackman and Baxley must comply with financial-disclosure laws.

And significantly, a comparison of the official DBPR job position descriptions for Blackman's position and Baxley's position—that is, the way that DBPR itself objectively described the positions of Chief of Operations and Chief of Auditing at a time when Blackman's EPA and Title VII challenges were not pending—reveals only negligible differences between the two positions.  For example, both position descriptions list precisely the same "[k]nowledge, skills, and abilities, including utilization of equipment, required for the position":

1. Thorough knowledge of Chapters 550, 551, and 849.086, Florida Statutes.
2. Thorough knowledge of Chapter 61D, Florida Administrative Code.
3. Excellent written and verbal communication skills
4. Ability to establish and maintain effective working relationships with employees, all levels of management, and customers.
5. Identify problems/issue and present feasible solutions
6. Lead, direct, coordinate, supervise and manage the work of staff
7. Provide leadership and motivation

29

This list can be boiled down to two overriding themes with respect to the necessary knowledge, skills, and abilities required for both the positions of Chief of Operations and Chief of Auditing:  (1) strong management skills, and (2) a thorough knowledge of PMW's responsibilities, powers, and duties.  The position descriptions for Chief of Operations and Chief of Auditing are absolutely identical in these regards, right down to the exact word choice and punctuation.  Neither position description identifies any type of knowledge, skill, or abilities required to do the job that the other does not.

We have previously explained that when we conduct a job comparison under the EPA, "[o]nly the skills and qualifications actually needed to perform the jobs are considered. . . .  The examination also rests on primary, as opposed to incidental or insubstantial job duties. . . .  The plaintiff need not prove that her job and those of the comparators are identical; the test is one of substantiality, not entirety." *Mulhall*, 19 F.3d at 592 (internal citations and quotation marks omitted).  Here, the position descriptions demonstrate that the skills and qualifications necessary for both Chief positions are precisely—not even just substantially—the same.

And the duties and responsibilities that each position description sets forth are substantially similar, as reflected below by the emphasized portions of the

30

duties and responsibilities of the Chief of Auditing, in comparison to the duties and

responsibilities of the Chief of Operations:

### Duties and Responsibilities of Chief of Operations

- Responsible for the development and implementation of rules, policies, and procedures applicable to conduct of pari-mutuel field operations, sample collections, and licensing for [PMW].
- Develops and implements on-the-job training procedures for all personnel involved [in] on-site pari-mutuel operations and conducts special training sessions on new laws, rules, licensing methods, and department requirements.
- Coordinates all pari-mutuel operations activities and plans work loads, work flows, deadlines, work objectives, and time utilization of subordinate employees.
- Researches, evaluates, and recommends management policy, practices, and control systems which improve the effectiveness of pari-mutuel operations, licensing, and/or Division operations.
- Maintains and provides statistics necessary to support PB2 measures.
- Creates and maintains flow charts for major business processes of the work unit.
- Establishes annual goals and objectives for the work unit.
- Effectively communicates with the Office of the Director regarding developing and on-going pari-mutuel and licensing issues.
- Performs other duties or special projects as required.

### Duties and Responsibilities of Chief of Auditing

- *Responsible for the development and implementation of rules, policies, and procedures applicable to conduct of pari-mutuel* compliance

31

audits, hub auditing, and quality assurance *for [PMW]*.

- *Develops and implements on-the-job training procedures for all personnel involved [in]* audit *and conducts special training sessions on new laws, rules, licensing methods, and department requirements.*
- *Coordinates all pari-mutuel* audit *activities and plans work loads, work flows, deadlines, work objectives, and time utilization of subordinate employees.*
- *Researches, evaluates, and recommends management policy, practices, and control systems which improve the effectiveness of pari-mutuel* auditing and quality assurance.
- *Maintains and provides statistics necessary to support PB2 measures.*
- Ensures the reliability of all PB2 measures, data, and collection processes.
- *Creates and maintains flow charts for major business processes of the work unit.*
- *Establishes annual goals and objectives for the work unit.*
- *Effectively communicates with the Office of the Director regarding developing and on-going pari-mutuel and* cardroom *issues.*
- Assists the legal staff in the prosecution of cases and administrative actions against licensees
- *Performs other duties or special projects as required.*

As these position descriptions reveal, both Chiefs conduct almost the same managerial duties, only each does so with regard to her or his particular subject-matter area. So, for example, while both Chiefs are "[r]esponsible for the development and implementation of rules, policies, and procedures applicable to conduct of pari-mutuel" activities, the Chief of Operations must conduct these

32

tasks as they relate to operations, while the Chief of Auditing must perform them as they regard audits. But the mere fact that each Chief executes her or his managerial duties with regard to different subject-matter areas does not somehow render the two otherwise nearly identical managerial duties and responsibilities not substantially similar for purposes of the EPA analysis, since "[t]he plaintiff need not prove that her job and those of the comparators are identical; the test is one of substantiality, not entirety." *Mulhall*, 19 F.3d at 592.

The position descriptions are the same in other regards as well: beyond the knowledge, skills, and abilities and duties and responsibilities previously discussed, neither position description has any "[l]icensure/registration/certifi-cation requirements" or "[o]ther job-related requirements." And both identify the Equal Employment Opportunity ("EEO") designation for position attributes as "02" (professionals) and the EEO collective bargaining unit as "87" (SES Supervisory Unit (excluded from the right to collectively bargain)). Similarly, neither position is entitled to overtime.[3]

The Majority responds to this overwhelming evidence of the substantial similarity of "skills and qualifications actually needed to perform" Blackman's and Baxley's jobs, *Mulhall*, 19 F.3d at 592 (internal quotation marks omitted), by

---

[3] Florida has also classified both positions within the same pay grade (530), pay-grade minimum ($45,173.44), and pay-grade maximum ($101,525.53). *See* http://www.dms.myflorida.com/workforce_operations/human_resource_management/for_state_h r_practitioners/broadband_classification_and_compensation_program at link for Broadband Crosswalk December 2014 at lines 1073, 1247 (last visited Dec. 30, 2014).

33

attempting to marginalize it, stating, "As we have noted, our cases require us to examine the 'actual job content,' not just job titles and descriptions." Maj. Op. at 10 (citing *Arrington v. Cobb Cnty.*, 139 F.3d 865, 876 (11th Cir. 1998)). But *Arrington*, the case that the Majority relies upon for that proposition, provides no basis for the job descriptions in this case to be effectively ignored.

In *Arrington*, the Fire Department had an Assistant Fire Chief for Administration and an Assistant Fire Chief for Operations. 139 F.3d at 868-69. The plaintiff served as the Assistant Fire Chief for Administration. *Id.* at 868. While the plaintiff was the Assistant Fire Chief for Administration, despite the fact that the plaintiff was not the Assistant Fire Chief for Operations in name, a management study of the Department found that the plaintiff was actually functioning as the Fire Chief's second in command for both Administration and Operations. *Id.* at 869. The Fire Chief himself agreed. *Id.* When the Department was restructured, the two Assistant Fire Chief positions were eliminated and replaced with a single Deputy Chief position. *Id.* at 869-70. Instead of being selected for that position, the plaintiff was instead demoted to the position of Lieutenant. *Id.* at 870. The plaintiff brought suit, alleging, among other causes of action, a violation of the EPA in that her alleged "successor" in the Deputy Chief position was paid more than she had received for her substantially equal work as the Assistant Chief. *Id.*

In concluding that a jury might reasonably find that the Deputy and Assistant Chief positions were "substantially equal," we explained, "While appellees emphasize [the plaintiff's] formal job title, [the plaintiff] points to significant evidence indicating that she exercised a wide range of duties as 'second in command' to [the] former Chief . . . , duties which very closely track those actually performed by [the] Deputy Chief . . . ." *Id.* at 876. In other words, the plaintiff presented evidence that she actually did far more than her job title or description as Assistant Fire Chief for Administration represented. When faced with a conflict between the paper job title and description, on the one hand, and the actual content of the job that the plaintiff did, on the other, we made a common-sense determination that reality must govern.

That common-sense determination to allow reality to govern should apply with equal force in this case, where Blackman has submitted the position descriptions as uncontested evidence of what her job and Baxley's job entail. Unlike in *Arrington*, Defendant here has presented no evidence to suggest that the description for either Blackman's or Baxley's position is incomplete or somehow wrong in actuality. DBPR does not contend that Baxley and Blackman engage in functions not set forth in their position descriptions, nor does it assert that they do not actually undertake the duties and responsibilities articulated in their position descriptions. DBPR similarly does not claim that the "[k]nowledge, skills, and

35

abilities, including utilization of equipment, required for [each] position" are not precisely what is stated in the position descriptions—no more and no less.  Instead, to show that the two Chief positions are not "substantially similar," DBPR relies exclusively on the fact that Blackman and Baxley conduct the same Chief managerial functions with respect to different subject matter.

But the managerial skills, knowledge, duties, and responsibilities, which are nearly identical for both positions—not the subject areas over which Baxley and Blackman use their managerial skills and knowledge and perform their managerial responsibilities—are at the core of the positions.  DBPR's litigation position is much like saying that an associate attorney working on Title VII litigation does not engage in substantially similar work to an associate attorney at the same large firm working on Fair Labor Standards Act litigation, even though both attorneys must draft and respond to interrogatories, production requests, and requests for admission; take and defend depositions; research legal issues; and prepare legal briefs.  The problem with such a construction of the "substantially similar" requirement is that it ignores the actual meaning of the phrase "substantially similar."  "Similar" means "*[r]elated in* appearance or *nature*; alike *though not identical*. . . ." *The American Heritage Dictionary of the English Language* 1622 (4th ed. 2000) (emphasis added).  "Substantial" means "1.  Of, relating to, or having substance; material. 2. True or real; not imaginary. . . . 5.  Considerable in

36

importance, value, degree, amount, or extent . . . ."  *Id.* at 1727.  Under the Majority's interpretation of the phrase, however, I respectfully submit that it is difficult to imagine a case where a plaintiff will be able to show "substantial similar[ity]" between two high-level managerial jobs that are not identical—a troubling proposition, considering that when high-level management positions are involved, there is generally no functional need for two identical management positions near the top of a structural hierarchy.  In short, in my opinion, Baxley is an appropriate comparator under the EPA.

### 3.    *Blackman Compared to Kogan*

Similar to Baxley, Kogan is a Bureau Chief who reports directly to Dillmore and is required to do essentially the same work as the other Chiefs, including certain projects, such as rulemaking or rule review.  He is also considered "key staff" capable of fulfilling some Director duties.  But Blackman has not satisfied her burden to establish Kogan as a proper comparator to herself under the EPA.  Unlike with Baxley, the record contains no job position description for Kogan's Chief-of-Investigations position.  For this reason, the record simply does not include enough information to determine whether Kogan is a proper comparator

for Blackman.  So I agree with the Court that, at least for purposes of the EPA,[4] Kogan is not an appropriate comparator.

## B.    *Evidence of Pretext*

Not only has Blackman introduced sufficient evidence to make out a *prima facie* case with respect to Karr and Baxley, she has also introduced enough evidence to raise a genuine issue of material fact about whether DBPR's proffered legitimate, nondiscriminatory reasons for the disparities between her salary and the salaries of Karr and Baxley are pretextual.  "At summary judgment, plaintiff's burden is simply to raise a genuine factual question as to the existence of pretext." *Mulhall*, 19 F.3d at 598.  The plaintiff need not present evidence beyond that used to make the *prima facie* showing.  *Id.*  If a plaintiff demonstrates that a material issue of fact exists regarding whether the employer's proffered reason for the pay disparity is pretextual, summary judgment must be denied.  *See Arrington*, 139 F.3d at 876.

DBPR contends that it considers several factors in determining an employee's salary, including (1) experience, (2) education, and (3) longevity, and that these factors account for the discrepancies between Blackman's salary and the salaries of Karr and Baxley.  There is no question that experience, education, and

---

[4] Kogan may well be a proper comparator for purposes of Title VII.  Because I conclude that Baxley and Karr are appropriate comparators under Title VII, however, and because this case is not being remanded for further proceedings, I do not also explore whether Kogan may so qualify.

38

longevity (or, seniority) can be legitimate, nondiscriminatory reasons for pay disparities when they are, in fact, the reasons for pay disparities. In this case, however, Blackman has submitted sufficient evidence to raise a material question about whether, in fact, experience, education, and longevity were the actual reasons for the pay disparities between Blackman and Baxley and between Blackman and Karr. As a result, summary judgment on the EPA claim should be reversed.

### 1.    *Salary Disparity Between Blackman and Baxley*

When Blackman was promoted to serve as Chief of Operations in September 2006, she received a pay increase to $2,220.70 per pay period, which became $2,287.32 per pay period in October 2006. A year after Blackman was appointed, in September 2007, Baxley became the Chief of Auditing at a higher salary of $2,349.41 per pay period. Blackman has presented evidence that raises a material issue of fact regarding whether the true reasons that Baxley was paid more than Blackman are experience, education, and longevity, as DBPR contends.

With regard to education, DBPR has claimed that "[a]n employee's education, especially considering where the education is directly related to the employee's job, is . . . a consideration in determining salary." A review of the record, however, suggests that DBPR did not actually give much weight to education—if it even considered it at all—when it set salaries for Baxley and Karr,

39

and the record contains no evidence showing that DBPR considered Blackman's education at the time that it set her salary as Chief of Operations. And, to the extent that education may have been considered, it does not explain the salary differentials.

First, on behalf of DBPR, Dillmore asserts that Baxley's Bachelor of Science degrees in accounting and business administration justify, at least in part, the fact that his salary was higher than Blackman's. But Dillmore did not even mention Baxley's degrees or education at the time that he recommended hiring Baxley as the Chief of Auditing and set forth the justification for establishing his salary. Instead, Dillmore stated simply, "Mr. Baxley's significant experience, knowledge, and insight will be vital to the regulatory oversight of the Office of Auditing. Based on these qualities, I recommend that he start at . . . $61,319.60 annually."[5] Substituting Blackman's name and her relevant position, the same could have been accurately said about Blackman when she was hired as the Chief of Operations: "Ms. Blackman's significant experience, knowledge, and insight will be vital to the regulatory oversight of the Office of Operations." In fact,

---

[5] If my colleagues in the Majority mean to suggest that the pay differential between Baxley and Blackman was relatively small, *see* Maj. Op. at 11 n.6, ("As of July of 2010, Mr. Baxley was earning $62.09 more than Ms. Blackman per pay period."), I am sure that the Court agrees that it was nonetheless a meaningful differential to the person who did not receive it. And a differential in pay of $62.09 per pay period—or $1,614.34 per year—is no more lawful under the Equal Pay Act and Title VII than a larger one, if it is attributable to the fact that the lesser-paid employee is a woman.

Dillmore nearly said as much about Blackman's qualifications to serve as Chief of Operations before she was appointed to the position: "I [Dillmore] told [the Division Director] I thought with [Blackman's] knowledge, skills, and abilities she could fulfill the role [as Chief of Operations]." Dillmore's attempts now for the first time—six years after Dillmore wrote the letter recommending Baxley's salary without referring to Baxley's education as a justification—to recharacterize the justifications for setting Baxley's starting salary higher than Blackman's as being based in part on Baxley's educational degrees raises a question of pretext.

Second, even if Baxley's education had factored into the setting of his salary—a contention that is not supported by the contemporaneous evidence-- Blackman's education should have been considered to the same degree in establishing her salary as a Chief. Both Blackman and Baxley have the same extent of education—both are college graduates. And, despite DBPR's and the Majority's assertions to the contrary, Blackman's educational background is highly relevant to her responsibilities as the Chief of Operations at PMW.

Blackman has a Bachelor of Science degree in political science with a minor in criminology and a certificate in public administration. Her study of criminology is extremely pertinent to her duties and responsibilities as the Chief of Operations: Blackman supervises the taking of and chain of custody on blood-sample collections and determines what to do with drug-test results. And Blackman's

41

specialized higher education in public administration is likewise directly relevant to Blackman's day-to-day duties because she oversees a division of a public regulatory agency and supervises numerous public employees. But DBPR did not appear to account for these relevant aspects of Blackman's education despite claiming that "education, especially considering where the education is directly related to the employee's job, is . . . a consideration in determining salary."

Third, Karr testified that, for several years before Baxley was appointed as the Chief of Auditing, he was in charge of auditing. Unlike Blackman and Baxley, Karr does not have a college education, but he was nevertheless paid more than Baxley (and Blackman) at all times. This evidence creates a serious question about whether DBPR's claim that Baxley's higher salary was based in part on his education is pretextual.

As for experience, DBPR likewise does not appear to have accounted for Blackman's experience in the same way that it evaluated Baxley's. First, while it is true that Baxley worked in a managerial capacity for DBPR for approximately six years longer than Blackman at the time that Baxley was promoted to serve as the Chief of Auditing, Blackman had a year of experience successfully serving as a Chief—not simply a lower-level manager—that Baxley lacked. Blackman also worked at DBPR for about six years longer than Baxley did in total. Yet Blackman's additional six years of longevity seem to have had no effect on her

42

salary in relation to Baxley's, even though Dillmore contended that longevity was one of the key considerations in setting salary and relied on it in part to try to explain Karr's higher salary.[6]

And Baxley's "significant experience and knowledge in the field of auditing" is no more considerable than Blackman's undisputed, extensive experience and knowledge in the fields of operations and licensing. Indeed, when Blackman began her position as Chief of Operations, she had eighteen years of experience in Operations and was roundly regarded as "the knowledge champion," the "data steward," and the "subject matter expert" for the Operations Division. Dillmore himself even told Blackman for two years before she was promoted that she was the "heir apparent" to the Chief-of-Operations position. DBPR presented no evidence that managing auditing is more challenging, more strenuous, or more important to DBPR than managing operations so as to justify Baxley's higher salary. In fact, Blackman's Chief position requires her to supervise more

---

[6] The Majority notes that, at the time of her promotion to Chief, Blackman received a 14% pay increase, while Baxley received only a 5% pay increase when he became Chief. Maj. Op. at 12 n.7. The reasons for the pay disparity between Blackman and Baxley before they became Chiefs is not a subject of this lawsuit, so the record does not provide a basis for us to evaluate the reasons for the pay differential. Obviously, though, if gender discrimination explains why Blackman's salary was so much lower than Baxley's before each became a Chief, the fact that Baxley received an incrementally smaller pay increase than did Blackman upon becoming a Chief cannot justify Baxley's continued higher salary at the time both became Chiefs. Nor, without more, can the mere fact that Baxley was paid more than Blackman before each became a Chief serve as a legitimate reason for why Baxley was paid more than Blackman when they each took their Chief positions. Indeed, "prior salary continuation alone is not a legitimate factor other than sex which would justify a pay disparity." *Irby v. Bittick*, 44 F.3d 949, 958 (11th Cir. 1995) (Carnes, J., dissenting).

43

employees than Baxley's Chief position, as the Office of Operations is the largest bureau in PMW.

Finally, it is worth noting that, after Blackman filed her lawsuit, DBPR gave her what it characterized as a "merit-based" salary increase to $2,365.36 per pay period, in comparison to Baxley's $2,349.41 per pay period. DBPR did this, even though Blackman's education, experience, and longevity did not change relative to Baxley's: the record contains no evidence that either Blackman or Baxley obtained any other educational degrees; Baxley still had six years' more management experience than Blackman; and Blackman still had more years of service at DBPR than Baxley. Moreover, Dillmore and others at DBPR had recognized Blackman's knowledge and merit since before she was appointed as the Chief. Indeed, that is why she was appointed as a Chief. That Blackman is now paid more than Baxley for serving as a Chief further suggests that nothing about the inherent nature of the Chief-of-Auditing position explains why Baxley was paid more for assuming that role than Blackman was upon becoming the Chief of Operations.

For these reasons, a jury could reasonably find DBPR's proffered reasons for Baxley's higher salary than Blackman's to be pretextual. As a result, summary judgment should not have been granted.

*2.    Salary Disparity Between Blackman and Karr*

At the time that Blackman was promoted to be the Chief of Operations, and, as such, Karr's supervisor, in October 2006, Blackman was paid $2,220.70, and Karr was paid $2,268.63.   Blackman's and Karr's respective salaries rose to $2,287.32 and $2,420.81, respectively, per pay period in October 2006.   Even today, more than eight years after Blackman's promotion to Karr's supervisor, Karr is paid more than Blackman.  DBPR contends that "Karr's salary[] is not due to gender, but is the result of his high level of management experience with DBPR and his longevity."

First, this explanation conveniently omits reference to educational background, which DBPR claimed was so important with respect to establishing Baxley's salary at a higher rate than Blackman's.  In light of DBPR's claim that educational background is a considerable factor in setting salary, the omission of this factor from DBPR's explanation of why Karr's salary is still higher than Blackman's in and of itself raises a question about whether DBPR's proffered reasons for the salary differential between Blackman, on the one hand, and Karr and Baxley, on the other, is pretextual.  Of course, had DBPR relied on educational background in setting Blackman's salary in relation to Karr's, it would have had to have accounted for the fact that Blackman held both a relevant college degree and

45

a relevant certificate, while Karr had neither.  That fact would have made it more difficult to explain the pay difference between Karr and Blackman.

Second, as to longevity, Blackman and Karr both became full-time career-service employees for the State of Florida in 1986.  In fact, salary documents indicate that Blackman's original appointment date preceded Karr's original appointment date by several months.  It is true that at the time of Blackman's appointment as Chief, Karr had worked in a management position for approximately nine years longer than Blackman.  But, upon her appointment as Chief of Operations, Blackman has held and continues to hold a higher position than Karr and has supervised him (and has done so for the past eight years, despite the fact that he continues to be paid more than she is).  This evidence raises yet another material question of fact about whether the reasons that DBPR provided for paying Blackman less than Karr were pretextual.  For this reason, summary judgment should have been denied.

### III.    Title VII Claims

#### A.    *Prima Facie Case*

The standard for establishing a *prima facie* case under Title VII is more relaxed than the standard under the EPA, so "if [a] plaintiff makes a prima facie case under the EPA, she simultaneously establishes facts necessary to go forward on a Title VII claim."  *Mulhall*, 19 F.3d at 598.  Because Blackman established a

*prima facie* case with respect to Karr and Baxley under the EPA, then, she also established a *prima facie* case with respect to those comparators under Title VII.[7]

But even if the difference in the subject areas that Baxley and Blackman manage were enough to conclude as a matter of law that Baxley's job as Chief of Auditing was not substantially similar to Blackman's job as Chief of Operations, the close similarities between the two positions would surely suffice to at least create a material issue of fact concerning whether Baxley was a proper comparator for purposes of Title VII. In *Mulhall*, we considered a similar case.

There, the plaintiff was the Vice President of Administration for her company, which specialized in security. *Id.* at 588. She was responsible for risk management, numerous personnel issues, loss prevention, litigation, insurance claims, licensing, leases, and other matters. *Id.* She sought to compare herself to a man who was appointed as the president of the company's investigations division. *Id.*

---

[7] Because I conclude that there is enough to reverse the grant of summary judgment using Baxley and Karr as comparators and because this case will not be remanded since I am not in the Majority, I do not separately address Logan as a comparator, except to note that the evidence of record does not appear to support the Majority's conclusion that Logan's salary was so much higher than Blackman's because of annual legislatively mandated cost-of-living-type raises. *See* Maj. Op. at 14-15. The record reveals that Logan was paid $52,780 in 2000 and then somehow jumped to a salary of about $66,000 just three years later in 2003. When he left in 2006, Logan was paid about $72,000. It seems highly unlikely that Logan obtained legislatively mandated cost-of-living-type raises totaling 25% of his salary in the three-year period between 2000 and 2003. This circumstance raises a question of pretext with respect to the DBPR's explanation for why Logan's salary, even in 2003, was so much higher than Blackman's was in 2006 and than Blackman's remains even today.

While we recognized that "investigative and administrative work are dissimilar," we nonetheless considered whether the administrative work of starting and running a new division was substantially similar to the administrative work that the plaintiff had done in her position. *Id.* We observed, "Both positions are fairly described as 'corporate department heads,' with both plaintiff and [the comparator] reporting to [the company's] president. Many of the job functions are identical. For example, both employees had responsibilities vis-à-vis affirmative action, EEO and coordination with other corporate entities." *Id.* Although we concluded that the plaintiff had not established that her position and that of the proposed comparator were "substantially similar" for purposes of the EPA analysis, we nonetheless noted that the record was "devoid of evidence regarding the amount of time and effort [the man] actually expended on investigative supervision, and the extent to which that supervision entailed personal investigative experience rather than generalized supervisory skills," and we concluded that the plaintiff had "raised a genuine issue of material fact regarding the similarity of the positions for the purposes of a Title VII suit." *Id.* at 599.

Blackman's case is more compelling. As discussed previously, unlike in *Mulhall*, where there was no indication that the skills and qualifications necessary for both positions were the same or even similar, here, DBPR itself has identified precisely the same necessary skills and qualifications for both Blackman's job and

48

Baxley's job. Similarly, in contrast to *Mulhall*, where the laundry list of the plaintiff's duties and responsibilities appears to have varied widely from the duties and responsibilities of the comparator, here, the core duties and responsibilities—managerial in nature—are nearly the same, just involving different subject matter. And, as in *Mulhall*, the record contains no evidence concerning the amount of time and effort that the comparator spends on the actual subject matter of his area, as opposed to on management of his division. For all of these reasons, our precedent requires the conclusion that Blackman at least has raised a material issue of fact regarding whether Baxley is a proper comparator for purposes of Title VII.

### B.    *Evidence of Pretext*

The analysis regarding pretext is the same under the EPA and Title VII. *See Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995); *Mulhall*, 19 F.3d at 598. Thus, for the reasons discussed above, a genuine issue of material fact exists as to whether DBPR's proffered reasons for the wage disparities between Blackman and Karr and Baxley are pretextual.

### IV.    Conclusion

For the foregoing reasons, the record contains material issues of fact concerning both Blackman's EPA and Title VII claims. Therefore, I would reverse the order of summary judgment and remand for further proceedings.

49