[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14433
Non-Argument Calendar

_____

D.C. Docket No. 2:16-cv-01844-SGC

KRISHNA REDDY,
GLORIA SELLMAN, M.D.,

Plaintiffs-Appellants,

versus

DEPARTMENT OF EDUCATION, THE STATE OF ALABAMA,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(April 2, 2020)

Before JILL PRYOR, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

Krishna Reddy and Gloria Sellman, two female doctors, appeal the district court's grant of summary judgment in favor of their employer, the Alabama Department of Education ("DOE"), on their claims of sex-based wage discrimination. The Alabama Disability Determination Services ("DDS"), a division of DOE, hired Reddy and Sellman as full-time Disability Determination Physicians ("DDPs") in 2009 and 2010, respectively. As DDPs, Reddy and Sellman evaluate claimants to determine whether they qualify for disability benefits. The DDP position is a permanent, classified position within the State of Alabama Merit System, and is subject to rules governing all aspects of employment, including initial salary, salary increases, and performance evaluations.

Upon learning that a subsequently hired male DDP, Peter Sims, was appointed at a higher initial salary than they were, Reddy and Sellman filed a complaint in the United States District Court for the Northern District of Alabama, alleging sex-based wage discrimination in violation of the Equal Pay Act ("EPA")[1]

---

[1] The relevant provision here, 29 U.S.C. § 206(d)(1), provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to

and Title VII of the Civil Rights Act of 1964.[2]  At the conclusion of discovery, all parties filed motions for summary judgment.  In dividing Reddy and Sellman's claims into two categories—initial salary disparity at appointment and pay disparity post-appointment—the district court found that Reddy and Sellman failed to show that DOE's legitimate explanations for the difference in initial salaries were pretext and that, because Reddy's and Sellman's salaries had increased as much as allowable under the rules regulating DOE, any pay disparity post-appointment was irrelevant.  The district court therefore granted DOE's motion and dismissed Reddy's and Sellman's claims.  We affirm.

## I.  Background

### A.  The Alabama Merit System

---

(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

[2] The relevant provision here, 42 U.S.C. § 2000e-2(a), provides:

It shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

3

DDS processes applications for social security disability benefits in Alabama. Some positions at DDS, including DDPs, are classified positions within the State of Alabama Merit System ("Merit System"), codified in Ala. Code § 36-26-1 *et. seq.* (1975). State regulations govern Merit System employees' salaries. As in effect when DDS hired Reddy, Sellman, and Sims (the comparator), Rule 670-X-8.02 of the Alabama Administrative Code provided:

> The salary rate of a new employee upon entrance into the service shall normally be the minimum rate of the range for the class of positions to which appointed. In the event it should prove impossible to obtain qualified personnel at such rate, the Appointing Authority may recommend and the Director may approve a hiring rate above the minimum rate but not to exceed the Base Maximum Rate of the range.

Ala. Admin. Code r. 670-X-8-.02 (1983).[3] The annual salary range for DDPs as set by the State of Alabama Personnel Department ("SPD") is $116,277.60 to $177,266.40. Within that assigned range are eighteen "steps," which represent the salary level of an employee. For DDPs, "Step 1" is the base level salary of $116,277.60. An employee's salary increases at each step. The highest step a DDP can achieve is "Step 18," which represents the maximum salary of

---

[3] In 2015, that regulation was amended to exclude the sentence beginning with: "In the event it should prove impossible to obtain qualified personnel at such rate…" *See* Ala. Admin. Code r. 670-X-8-.02 (2015). In their reply briefs, Reddy and Sellman describe DOE's omission of this language throughout this case as a "critical oversight." Because DOE requested that *all* current DDPs receive an above the minimum initial salary upon hire, including Reddy, Sellman, and Sims, this amendment does not affect the analysis.

The 2015 amendment also added that "[t]he above the minimum hiring rate will be based on the recent salary or experience of the new employee or competitive market." *See* Ala. Admin. Code r. 670-X-8-.02 (2015).

$177,266.40. Thus, pursuant to the Alabama Administrative Code, DOE must receive approval from SPD in order to hire an employee with a salary exceeding $116,277.60 (the minimum rate). *See* Ala. Admin. Code r. 670-X-8-.02 (1983).

SPD provides not only a general floor, but also an individualized ceiling for Merit System employees' initial salaries. In general, the applicant's initial salary cannot significantly exceed his current salary: SPD will not approve a request for more than five percent above the applicant's current salary or salary within the preceding six months. But if the applicant previously contracted with the state entity, SPD determines the maximum allowable salary by calculating the salary that the applicant would have received according to the Merit System had the applicant been employed full-time. The appointing authority may set a Merit System employee's initial salary within the range permissible under these rules.

After they are appointed with a set initial salary, employees' steps increase based on their length of service and performance. From the start, Merit System employees must successfully complete a six-month probationary period to receive "permanent status," which qualifies them for a discretionary one- or two-step increase.[4] Thereafter, Merit System employees are eligible for annual raises of one

---

[4] Ala. Admin. Code r. 670-X-8-.04(1) provides:

A probationary employee who has successfully completed probation may be granted a performance salary increase effective at the beginning of the first semi-monthly pay period after the conclusion of the probationary period, and the first

or two steps, depending on their annual performance evaluations.  Merit system employees' steps may increase each year until they reach the maximum step in the applicable range.  All Alabama state agencies follow this process.[5]

B.  DDP Salary Determinations

Three full-time DDPs are relevant to this appeal: (1) Reddy (female) was hired in 2009 at Step 3; (2) Sellman (female) was hired in 2010 at Step 3; and (3) Sims (male) was hired in 2014 at Step 14.

Reddy, a board-certified neurologist, initially applied for a DDP position in March 2008, but withdrew her application to accept a position elsewhere, and later resumed the DDP application process in 2009.  Reddy was hired at Step 3, earning $122,232 annually.  Reddy's application indicated that she practiced neurology at Birmingham Neurology, P.A. from July 1980 until her retirement in August 2005.  As part of her practice, she occasionally performed physical examinations for DDS on a non-contractual basis.  Between 2007 and 2008, she worked as a residential

---

day of that pay period shall be the employee's anniversary date for future salary administration purposes. The salary advance may be one or two steps, depending upon the manner of performance of the employee during probation, as recommended by the employee's immediate supervisor and approved by the appointing authority, with report to the Director of the action to be taken.

[5] The only exceptions to this process are Special Merit Raises.  Pursuant to *Ala. Admin. Code* r. 670-X-8-.04(3), a State agency or department may request a Special Merit Raise for an employee who has performed above and beyond their normal duties.  These requests must be sent directly to the State Personnel Board and are rarely granted.  Special Merit Raises were frozen from January 1, 2009 through December 31, 2013 and DOE has not requested any Special Merit Raises since the 2009 freeze.

worker caring for three mentally disabled men and as an office worker in a city parks and recreation department. Reddy did not provide medical care in either of those positions. In May 2008, Reddy started a job as a clinical research coordinator in the Department of Nephrology at the University of Alabama Birmingham ("UAB"). Normally, a registered nurse would staff this position. In the latter half of 2008, Reddy began spending every other Saturday at the VA, examining veterans for neurological conditions. Reddy resumed the application process in 2009 but did not amend her 2008 application to include her more recent experience as a research coordinator at UAB and diagnostician at the VA. Nor did she include information pertaining to her salary in 2008, which she testified was $57,000 at UAB and $230 per hour at the VA. She did submit a 2005 W-2 form, indicating that before she retired from private practice, she was on track to earn $155,817 that year.

Sellman was hired as a DDP in 2010 at Step 3, with an annual salary of $122,232. Since becoming a board-certified anesthesiologist in 1987, Sellman held concurrent academic and clinical positions at Georgetown University School of Medicine, the National Institute of Health, the University of North Carolina at Chapel Hill School of Medicine, the University of Alabama at Birmingham School of Medicine, and the Children's Hospital of Alabama. Between August 2008 and

September 2010, she worked as a contract medical consultant with DDS.[6]  In 2009

and the first eight months of 2010, Sellman earned $101,232 and $71,854

respectively.  She submitted this salary information as part of her application

process with DDS.

Sims, a board-certified psychiatrist, was hired as a DDP in 2014 at Step 14,

with an annual salary of $160,440.  His background reflected that he specializes in

child and adolescent psychiatry.  He graduated from medical school in 1985 and

completed his residencies and fellowship in 1991.  In the 14 years preceding to his

DDP appointment, Sims worked under contract as a part-time medical consultant

for DDS.  In addition, since the early to mid-1990s, he maintained a private

psychiatry practice.  He submitted documentation with his DDP application

showing an annual salary of $198,950.00.

Reddy, Sellman, and Sims each received a two-step increase at the end of

their six-month probationary periods.  In addition, based on their performance

reviews, they all qualified for, and received, two-step salary increases each year

they were eligible.[7]

---

[6] In addition to the full-time DDPs, DDS employs over 60 hourly, part-time medical consultants who perform similar work to DDPs.  These consultants are not subject to the Merit System: their hourly salary is uniformly set by DDS and they do not receive any state benefits.

[7] Occasionally, the Governor orders merit-raise "freezes" for budgetary reasons.  On January 1, 2009, then-Governor Bob Riley ordered a merit-raise freeze which remained in place until December 31, 2013.  During that period, no state agency, including those funded by the

In August 2015, Reddy learned that Sims was earning a higher salary.  She shared her concerns with Sellman, and together they made a formal grievance to the current DDS Director, Jim Methvin.  Methvin investigated and determined that their grievance was "unfounded."  In his September 18, 2015 letter to Reddy and Sellman regarding their grievance, Methvin explained the factors DDS considers in recommending that an applicant receive an above the minimum initial salary:

> (1) The doctor's current clinical work. It is important to determine whether the doctor is working in a clinical setting providing medical treatment and interacting with patients[;] (2) Past work experience.  This can be experience with DDS and other employers[;] (3) Communication skills.  The doctor must work one-on-one with disability examiners and DDS medical staff[;] (4) Overall medical knowledge[;] and . . . [(5) the chosen candidate's current salary].[8]

Tommy Warren, the Director of DDS at the time of Reddy's and Sellman's appointments, and Norman Ippolito, the DDS Director at the time of Sims's appointment, confirmed they considered these factors in recommending appointment above the minimum step of the applicable pay grade.

---

federal government, could issue any merits raises.  On January 1, 2014, employees were once again eligible for raises, but could not increase their steps retroactively.  Accordingly, Reddy and Sellman were not eligible to receive step increases from 2009 through 2014.  Without the freeze, Reddy and Sellman would have reached Step 18 by 2019.  Because of the freeze, they cannot reach Step 18 until 2024.  Sims reached Step 18 in 2016.

[8] Reddy and Sellman never disputed that Sims's current income was higher than theirs at the time they applied for the DDP position.  All three received (at least) the maximum-allowable initial salaries according to their current salaries and the SPD rules.  In fact (and inexplicably), Reddy received a salary greater than the maximum allowable based on her application.

In particular, whether a physician, at the time of his or her appointment works in a clinical setting (*i.e.* providing medical treatment to and interacting with patients) is "extremely important" in considering an above-the-minimum appointment.  At the time of her appointment, Reddy had not performed clinical work since her retirement from private practice four years prior.[9]  Similarly, Sellman had not performed clinical work for 12 years prior to her appointment.  In contrast, at the time he was appointed, Sims was seeing patients at his private practice—as he had since the mid-1990s.

Another consideration in determining the applicant's initial salary is the applicant's specialty and whether DDS struggles to recruit and retain physicians in that field.  According to Ippolito and Methvin, DDS has difficulty recruiting and retaining psychiatrists, such as Sims.  Further, DDS benefits from having a full-time psychiatrist to evaluate mental health claims, especially a psychiatrist who has as much experience with such claims as Sims.  On the other hand, Reddy and Sellman did not have a specialization that DDS had difficulty recruiting.

---

[9] In her response to DOE's motion to dismiss, Reddy argued that she performed clinical work in her position as a clinical research coordinator at UAB.  But Reddy's testimony concerning her job responsibilities in that role belies her assertion.  She testified that she reviewed patient records, talked to patients, performed lab data, and performed cost studies. Reddy did not diagnose or otherwise provide medical care to patients as a physician.  Reddy did perform some clinical work every other Saturday as a diagnostician at the VA, but she only began that work a few months before joining DDS.

10

On November 16, 2016, Reddy and Sellman filed the underlying complaint against DOE.  They alleged DOE discriminated against them on the basis of their sex by failing to pay them the same salary as Sims, who performed similar work. After discovery, Reddy, Sellman, and DOE filed cross-motions for summary judgment.  DOE asserted, in relevant part, that Reddy and Sellman were not entitled to relief because the Alabama Merit System and factors other than sex explained the pay discrepancy—including clinical experience, experience with DDS, and current salary upon hire.

## C. The District Court's Decision

Before the district court issued its decision on the parties' motions for summary judgment, Reddy and Sellman filed a joint motion for leave to file new controlling case law: *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358 (11th Cir. 2018). The district court granted the motion.

Five months later, the district court granted summary judgment in favor of DOE.  In doing so, the district court separated Reddy and Sellman's EPA and Title VII claims into appointment claims (those arguing they should have been hired at the same initial salary as Sims) and post-appointment claims (those arguing that, upon their 2015 complaint to Methvin, DOE should have given them raises to bridge the gap between their salary and Sims's salary).  Without considering *Bowen*, the district court concluded that Reddy and Sellman were not entitled to

11

relief on their post-appointment claims because they each had received the maximum two-step merit raise each year such raises were available, and, therefore, "[they] could not have advanced more steps on the applicable pay grade scale since their respective appointments."

With regard to their appointment claims under the EPA, the district court assumed Reddy and Sellman had established a *prima facie* case of discrimination. Nevertheless, the district court concluded that DOE was entitled to summary judgment because Reddy and Sellman failed to show that DOE's proffered factors other than sex justifying Sims's higher initial salary were pretextual. Likewise, the district court concluded that DOE was entitled to summary judgment on Reddy's and Sellman's Title VII claim because it was "based on the same facts underlying their [EPA] claim," and plaintiffs had "failed to rebut [DOE's EPA] defense with affirmative evidence of pretext."

## II. Standard of Review

We review a grant of summary judgment *de novo*, viewing all facts in the record in the light most favorable to the nonmovant and drawing all inferences in her favor. *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001). Summary judgment is appropriate where "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A plaintiff cannot defeat summary judgment by relying on conclusory allegations; we have "consistently held that

12

conclusory allegations without specific supporting facts have no probative value" at summary judgment. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924-25 (11th Cir. 2018) (quotations omitted). "Speculation also does not create a genuine issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

## III.  Discussion

Reddy and Sellman present two issues on appeal: (1) whether the district court erred in granting DOE's motion for summary judgment as to Reddy's and Sellman's EPA and Title VII claims based on its finding that a "factor other than sex" justified DOE's decisions regarding their pay; and (2) whether the district court erred in focusing the inquiry on Reddy's and Sellman's initial salaries implicitly dismissing their post-appointment claims of sex-based wage discrimination under the EPA and Title VII.

A. Appointment Pay Discrimination Claims

The district court did not err in dismissing Reddy's and Sellman's EPA and Title VII claims that DOE illegally appointed them at lower salaries based on their sex.  Reddy and Sellman failed to present affirmative evidence that DOE's explanation for the pay differences was pretext.

The EPA prohibits employers from discriminating between employees on the basis of sex in the payment of wages.  29 U.S.C. § 206(1).  We apply a burden-shifting framework to analyze sex discrimination claims brought pursuant

13

to the EPA.  *Mulhall v. Advance Sec., Inc.,* 19 F.3d 586, 590 (11th Cir. 1994).

Under this framework, the plaintiff must first establish a *prima facie* case by

showing "that the employer paid employees of opposite genders different wages

for equal work for jobs [requiring] 'equal skill, effort, and responsibility, and

which are performed under similar working conditions.'"  *Steger v. Gen. Elec. Co.*,

318 F.3d 1066, 1077–78 (11th Cir. 2003) (quoting *Irby v. Bittick*, 44 F.3d 949, 954

(11th Cir. 1995)).

If the plaintiff establishes a *prima facie* case, the burden shifts to the

employer to prove, by a preponderance of the evidence, that the pay discrepancy is

based on one of the four affirmative defenses provided for in the EPA: "(i) a

seniority system; (ii) a merit system; (iii) a system which measures earnings by

quantity or quality of production; or (iv) a differential based on any other factor

other than sex."  29 U.S.C. § 206(d)(1); *Irby*, 44 F.3d at 954.  "The burden is a

'heavy one' because the '[employer] must show that the factor of sex provided no

basis for the wage differential.'"  *Id.* at 954 (emphasis in original) (quoting

*Mulhall*, 19 F.3d at 590); *see also Bowen*, 882 F.3d at 1362.  "While an employer

may not overcome the burden of proof on the affirmative defense of relying on

'any other factor other than sex' by resting on prior pay alone, . . . there is no

prohibition on utilizing prior pay as part of a mixed-motive, such as prior pay *and*

more experience."  *Irby*, 44 F.3d, at 955.

14

The plaintiff may then rebut the explanation with evidence showing that the employer's proffered explanation is "pretextual or offered as a post-event justification for a gender-based differential." *Id*. at 954.  To establish pretext, the plaintiff "must produce evidence which directly establishes discrimination, or which permits a jury to reasonably disbelieve the employer's proffered reason." *Steger*, 318 F.3d at 1079; *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1472 (holding that, in the ADEA context, where employee "present[s] insufficient evidence that the nondiscriminatory reason is unworthy of credence or that [discrimination] more likely than not was a motivating factor, the jury's verdict [finding pretext] cannot stand").   An employee cannot establish pretext "by simply quarreling with the wisdom" of the defendant's proffered nondiscriminatory reason.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc); *see also Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018) (summary judgment was appropriate where employee merely "quarreled with the wisdom of [her employer's] reasons, [but] failed to point to any affirmative evidence establishing that his proffered reasons were false or a pretext for unlawful sex discrimination").  If the plaintiff fails to produce such evidence, the district court does not err in granting summary judgment in favor of the employer. *Steger*, 318 F.3d at 1078–79.

15

Title VII provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). When the plaintiff bases a Title VII claim on circumstantial evidence, we review the claim under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992). Similar to an EPA claim, the plaintiff bringing a Title VII claim must first establish a *prima facie* case. *McDonnell Douglas*, 411 U.S. at 802; *Miranda*, 975 F.2d at 1528. To do that, the plaintiff must show that she was a qualified member of a protected class and subjected to an adverse employment action in contrast to similarly situated employees outside the protected class. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).

And with the *prima facie* case established, just as with an EPA claim, "[t]he burden then shifts to the [employer] to articulate some legitimate, nondiscriminatory reason for [its actions]." *Miranda*, 975 F.2d at 1528. Moreover, the affirmative defenses of the EPA have been incorporated into Title VII. *Cty. of Washington v. Gunther*, 452 U.S. 161, 176 (1981); *Miranda*, 975 F.2d at 1528. Finally, where the employer meets its burden, "the plaintiff must then

16

prove that the legitimate reason offered was a mere pretext for an illegal motive." *Miranda*, 975 F.2d at 1528; *see also Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2015) (holding that, in the Title VII context, in order to withstand summary judgment on the issue of pretext, a plaintiff "must demonstrate that the proffered reason was not the true reason for the employment decision") (quotations omitted).  The plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Jackson¸*405 F.3d at 1276.

Here, assuming as the district court did that Reddy and Sellman established a *prima facie* case of sex-based wage discrimination, the district court did not err in dismissing their EPA appointment pay discrimination claims because they did not present affirmative evidence that DOE's explanation for the initial pay differences was pretextual.  *See Irby*, 44 F.3d at 954.  DOE asserted, and the district court found, that Sims was appointed at a higher initial salary than Reddy and Sellman because he: (1) had worked for DDS for nearly 14 years as a contract physician, (2) possessed current clinical experience, (3) held a higher, substantiated, current annual income than Reddy and Sims, and (4) specialized in a field that was hard to recruit and retain (psychiatry).

17

On appeal, Reddy and Sellman do not address the first three factors.[10] Rather, they take aim only at the last factor: DOE's difficulty in recruiting psychiatrists. Specifically, they assert that DOE's explanation that psychiatrists such as Sims were difficult to recruit and retain is pretextual because: (1) DOE never recruited or posted an advertisement for a full-time psychiatrist DDP position; (2) Sims was one of four qualified applicants for the posted general DDP position; (3) DOE did not recruit Sims for the job when he was a part-time contractor; and (4) Sims did not negotiate his initial salary.

When considered with other relevant facts, these assertions could not lead a reasonable juror to conclude that DOE's justification is "unworthy of credence." *Burdine*, 450 U.S. at 256 (Title VII); *Hornsby-Culpepper*, 906 F.3d at 1312 (EPA). To begin, DOE's employees' testimony supports its explanation. Both Methvin and Ippolito (the current and former DDS Directors) testified that they had difficulty recruiting and retaining psychiatrists. And Methvin testified that, in

---

[10] We note that in order to avoid summary judgment, a plaintiff must produce "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of *each* of the employer's proffered reasons for its challenged action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997) (Title VII); *see also Irby*, 44 F.3d at 954–57 (EPA). But, before this Court, Reddy and Sellman have only attempted to rebut *one* of DOE's *four* proffered explanations. They have therefore abandoned any arguments pertaining to the other three. *See Marek v. Singletary*, 62 F.3d 1295, 1298 n. 2 (11th Cir.1995) ("Issues not clearly raised in the briefs are considered abandoned."). Thus, even assuming *arguendo* that the evidence supported their objections to that one explanation, we would still affirm the district court's grant of summary judgment.

18

comparison to Sims, DDS had no difficulty recruiting DDPs with Reddy's and Sellman's specialties.

Moreover, the record undercuts the select facts Reddy and Sellman rely on to discredit this testimony. As for their claim that DOE never actively recruited or posted job advertisements for a psychiatrist, in fact, DOE *could not* post a job announcement for a psychiatrist DDP position because only SPD posts job announcements. Even then, SPD only posts for positions with defined Merit System classifications. There is no specific Merit System classification for DDPs who specialize in psychiatry—only DDPs, generally. Along those lines, although Reddy and Sellman correctly point out that Sims was one of four applicants for a general DDP position, they have not shown whether he was the only psychiatrist that applied for that position. Further, Ippolito believed Sims is the only psychiatrist DDS has ever employed full-time in a merit position. And the numbers reveal that DDS is not inundated with contract part-time psychiatrists: of the 61 DDS physician consultants, only seven (approximately twelve percent) are psychiatrists.

Nor do DDS's lack of recruiting efforts or Sims's acceptance of his salary offer without negotiation create an inference that DDP could easily recruit qualified psychiatrists. Methvin testified that he does very little in the way of recruiting besides placing ads for consultants, receiving "calls of interest," and,

19

from time to time, asking consultants whether they know of anyone who might be interested in a position.  Instead of formal recruiting, SPD posts the DDP position, reviews the applicants, and provides DOE with a list of the top contenders.  Reddy and Sellman have not shown that DDS even has the authority to recruit DDPs. With regard to negotiation, Sims's independent decision to accept his salary without negotiation does not show DOE's justification is ingenuine.

Reddy and Sellman make a final, general objection to the veracity of DOE's explanations: that their salary must be based on their sex because Sims's salary is higher than theirs even though he "has been notified of low production, and performs four of five responsibilities."  But these facts go to the post-appointment step-level increases, and not the difference between their respective initial salaries. Nor do they address DOE's explanations.

Accordingly, Reddy and Sellman have not offered any evidence that would lead a reasonable juror to believe that the proffered non-sex based factors that were the basis for the salary appointment difference were pretextual.[11]  We therefore conclude the district court did not err in granting DOE's motion for summary judgment as to Reddy's and Sellman's EPA appointment pay discrimination claim. For the same reasons, the district court also did not err in granting DOE's motion

---

[11] Because we find in favor of DOE based on its "factors other than sex" affirmative defense, we do not address its merit system defense.

20

for summary judgment as to Reddy's and Sellman's Title VII pay discrimination appointment claim.

B.  Post-Appointment Pay Discrimination Claims

Reddy and Sellman argue that the district court erred in granting DOE's motion for summary judgment as to their post-appointment pay discrimination claims.  They contend that their injuries (which started at the time they were appointed) were continuing in nature and extended to their request for a raise to bring their respective salaries in line with Sims's salary.  Thus, they argue that the district court erred in failing to apply the continuing violation doctrine to their EPA and Title VII claims. Additionally, they argue that our decision in *Bowen* demonstrates that DOE's failure to raise their incomes to match Sims's violated the EPA and Title VII. Because neither the continuing violation doctrine nor *Bowen* apply to this case, the district court properly focused its inquiry on the initial appointment salaries. The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period.  *Center for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006); *Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 799–800 (11th Cir.), *opinion amended on reh'g*, 850 F.2d 1549 (11th Cir. 1988). Although we have long held that "[s]ex-based, discriminatory wage payments constitute a continuing violation of the [EPA]," *Hodgson v. Behrens Drug Co.*, 475

21

F.2d 1041, 1050 (5th Cir. 1973), the continuing violation doctrine has no application here because the district court did not hold, nor did DOE argue, that Reddy's and Sellman's claims were time-barred.

Similarly, Reddy's and Sellman's argument that summary judgment was inappropriate in light of *Bowen* is unpersuasive.  In *Bowen*, we reversed the district court's grant of summary judgment in favor of Bowen's private sector employer on her EPA and Title VII sex-based wage discrimination claims.  882 F.3d at 1364. Like this case, Bowen replaced a male manager at a significantly lower initial salary than he had received.  *Id.* at 1360−61. But unlike this case, Bowen's salary was consistently below the midpoint salary for arbitration managers for a number of years, thus undercutting its affirmative defense.  *Id.*  Further, Bowen presented evidence which indicated that her employer's general managers were influenced by sex bias in personnel matters, including but not limited to the wage context.  *Id.* at 1363.  We thus concluded that, in light of the evidence proffered by Bowen, there was a genuine issue of fact regarding whether Bowen's sex was a basis for the pay disparity.  *Id.* at 1363.

Here, the district court did not err in failing to address *Bowen* because the case is inapplicable to Reddy's and Sellman's post-appointment claims.  Whereas *Bowen* involved a private corporation that had complete discretion over its employees' salaries and raises, this case deals with a state agency that is subject to

codified rules and regulations which govern its employees' salaries and raises.  *See* Ala. Code. § 36-26-1-1 (2009).  To the extent DDS could control post-appointment salaries, it gave Reddy, Sellman, and Sims equivalent raises: they each received a two-step raise upon completion of probation and two-step raises every year merit raises were available.  And neither Reddy nor Sellman have presented any evidence of sex bias at DDS outside of the wage context.

## IV. Conclusion

Accordingly, in light of the foregoing, the district court did not err in granting summary judgment in favor of DOE.

**AFFIRMED.**